Second Lieutenant Christopher M.
COOKE, Petitioner, U. S.
Air Force,

v.

Lieutenant Colonel David ORSER, et
al., Respondents.

Misc. Dkt. No. 81–59.

U. S. Court of Military Appeals.

Feb. 22, 1982.

See also 12 M.J. 17.

For Petitioner: *F. Lee Bailey*, Esq. (argued); *Captain J. Laurens Tullock, Captain Francis W. Pedrotty, III, Kenneth J. Fishman*, Esq. (on brief).

For Respondents: *Captain Michael J. Hoover* (argued); *Colonel James P. Porter* (on brief).

Amicus Curiae

*On behalf of Petitioner*: For the American Civil Liberties Union and the Association of the Bar of the City of New York— *Eugene R. Fidell*, Esq. (argued); *Bruce J. Ennis, Jr.*, Esq., *Charles S. Sims*, Esq., *Arthur B. Spitzer*, Esq., *Eugene Wollan*, Esq., *Steven S. Honigman*, Esq. (of counsel).

For Navy Appellate Defense Division— *Captain W. J. Ciaravino*, USMCR (argued); *Commander Walter J. Landen, Sr.*, JAGC, USN (on brief).

For the Appellate Litigation Clinical Program, Georgetown University Law Center—*Steven H. Goldblatt*, Esq. (argued); *Samuel Dash*, Esq. (on brief); *Louis R. Moffa, Jr., Una Maria Perez, David A. Barra, Sharon McCarthy* (student counsel).

For Coast Guard Appellate Defense Division—*Lieutenant Dana J. St. James*, USCGR (on brief).

*On behalf of Respondents* : For Navy Appellate Government Division, *Major Charles William Dorman*, USMC (argued); *Commander T. C. Watson, Jr.*, JAGC, USN (on brief).

For Army Appellate Government Division—*Colonel R. R. Boller, Major John T. Edwards, Captain Glenn D. Gillett* (on brief).

For Coast Guard Appellate Government Division—*Lieutenant Commander Mark A. O'Hara*, USCG (on brief).

For the United States Department of Justice—*Rudolph W. Giuliani* (Associate Attorney General), *D. Lowell Jensen* (Assistant Attorney General, Criminal Division), *Richard K. Willard, Lubomyr M. Jachnycky, Ronald S. Flagg* (on brief).

*Opinion of the Court*

FLETCHER, Judge:

The petitioner comes before this Court seeking extraordinary relief in the form of a writ of mandamus directing the military judge at his court-martial to dismiss the charges[1] against him. 28 U.S.C. § 1651(a); *Chenoweth v. Van Arsdall*, 22 U.S.C.M.A. 183, 188, 46 C.M.R. 183, 188 (1973). He asserts that his prosecution for these of-fenses is barred by a promise of immunity made by an authority competent to make such a promise or ratified by an authority so empowered. *See* para. 68*h*, Manual for Courts-Martial, United States, 1969 (Revised edition). In the alternative, he maintains that due process of law requires that his agreement with military authorities be enforced and the charges against him be ordered dismissed. U.S.Const. amend. V.

The trial judge at petitioner's court-martial entertained a motion to dismiss based on similar grounds. *See* para. 68*a*, Manual, *supra*. After making specific findings of fact and law with respect to this motion,[2] he denied petitioner's request. He found that the Commander-in-Chief of the Strategic Air Command (SAC), the original general court-martial convening authority in this case, "did not promise or grant accused immunity from prosecution at any time."[3] He also found that this commander did not "authorize . . . his Staff Judge Advocate, or anyone else to make any such promise or grant in his behalf."[4] The trial judge likewise found that the SAC commander "[a]t no time did . . . in his capacity as General Court-Martial Convening Authority, ratify any alleged promise of immunity or no prosecution offered . . . [to petitioner] by any person purporting to act pursuant to lawful authority."[5] Finally, the trial judge held that "[e]quitable immunity or estoppel may not be granted in the absence of actual authority."[6]

In Part IV of his memorandum of ruling, the trial judge acknowledgèd, as he had found earlier, that petitioner had "suffered . . . detriment" as a "consequence of unauthorized promises of immunity." He

---

1. The petitioner is charged with 10 specifications of violating AFR 205–57 by failing to report visits to and contacts with the Soviet Embassy, in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, and 3 specifications of transferring information contrary to 18 U.S.C. § 793(d), in violation of Article 134, UCMJ, 10 U.S.C. § 934.

2. These findings of fact and law by the military judge are attached to this decision as an appendix. All references in these footnotes are to Part III of this appendix unless otherwise indicated.

3. Finding 1. The trial judge in Finding 18a states somewhat inconsistently:

 a. Of greater import, General Ellis never authorized any agreement except that which pertained to the May 7 statement.

4. Finding 1.

5. Finding 2.

6. Finding 2a.

opined[7] that the confession of petitioner made in response to these promises and formally "executed on 17 May 1981 was involuntary" and inadmissible because it was unlawfully induced by "unauthorized, defective promises of immunity."[8] Moreover, he further noted that any evidence derived from these statements would also be inadmissible.

■ Espionage, like treason, is a serious offense against the United States Government and the security of the people our Government serves. *See* Clark and Marshall, *A Treatise on the Law of Crimes* § 14.00 (7th ed. 1967). An allegation or charge of espionage by itself, however, does not constitutionally justify depriving an accused of due process of law. *Abel v. United States*, 362 U.S. 217, 219–20, 80 S.Ct. 683, 686, 4 L.Ed.2d 668 (1960). Moreover, in view of Article 1, Section 9, of our Constitution, an accused's right to due process may not be suspended in the public interest unless in time of a rebellion or invasion. This is basic constitutional law.

■ A service member, like his civilian counterpart, is "entitled to the due process of law guaranteed by the Fifth Amendment" to the Constitution. *Middendorf v. Henry*, 425 U.S. 25, 43, 96 S.Ct. 1281, 1291, 47 L.Ed.2d 556 (1976). Of course, in determining what process is due to the American service member, particular deference must be given to the determinations of Congress made under its authority to regulate the land and naval forces. *Id.* See U.S.Const. art. I, sec. 8, cl. 14. Courts-martial, as courts of "limited jurisdiction," (*Runkle v. United States*, 122 U.S. 543, 555, 7 S.Ct. 1141, 1145, 30 L.Ed. 1167 (1887)) are empowered and responsible for protecting a service member's constitutional rights, including due process. *Schlesinger v. Councilman*, 420 U.S. 738, 757–60, 95 S.Ct. 1300, 1312–14, 43 L.Ed.2d 591 (1975); *Burns v.*

*Wilson*, 346 U.S. 137, 142, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953) (plurality opinion). This is basic military law.

■ A convening authority and his staff judge advocate in their prosecutorial roles in the court-martial system act on behalf of our federal government. As such, they clearly have the responsibility to comply with the Constitution and the Uniform Code of Military Justice in performing these functions. *Middendorf v. Henry, supra; Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Accordingly, as broad as their discretion may be in these command matters, it cannot be considered plenary or unrestricted. *Cf. Dynes v. Hoover*, 61 U.S. (20 Howard) 65, 15 L.Ed. 838 (1858); Winthrop, *Military Law and Precedents* 447 (2d ed., 1920 Reprint). In the court-martial system, the Constitution and the Code are ultimately in command. This is basic military justice.

## I

The facts as found by the trial judge and his rulings as a matter of law in this case are reminiscent of the situation presented in *United States v. Milburn*, 8 M.J. 110, 114 (C.M.A.1979). There a majority of this Court stated:

> It is clear from his ruling that he concluded that the appellant as a witness at the earlier court-martial had been unfairly treated. Yet, he failed to act to protect the appellant from the perpetuation of this unfairness because of his perception of an apparent conflict between the previously cited Manual provisions. Such motivated inactivity drastically undermines his authority and responsibility as a military judge to ensure a military accused a fair court-martial, and cannot be condoned.

So too in the present case, the trial judge found that petitioner was treated unfairly

---

7. We note that the trial judge has not ruled as to the exclusion of any evidence; he awaits "a timely motion to suppress." Findings, Part IV.

8. The original disclosures by petitioner were also made after the government investigators intentionally refused to advise him of his rights

under Article 31, UCMJ, 10 U.S.C. § 831. Finding 9. The additional disclosures were made only after "an express revocation of the" earlier advisement of rights given by the agents. Findings 20 and 21.

in the manner in which he was brought to court-martial by military authorities. Likewise, he refused to act to remedy this wrong because of his reliance on a Manual provision, this time paragraph 68*h*, Manual, *supra.*

This is not military justice as authorized by the Constitution and established by the Uniform Code of Military Justice. Para. 68 *h*, Manual, *supra*, does not in any way obviate the responsibility of the trial judge to afford a military accused due process of law. *See* Article 39(a), UCMJ, 10 U.S.C. § 839(a); para. 39*b*, Manual, *supra.* Irrespective of the legal effect of this Manual provision on an agreement not to prosecute, it was clearly not intended by the President as a panacea for prosecutorial misconduct by a staff judge advocate acting under apparent authority of a convening authority. *See generally United States v. Hardin,* 7 M.J. 399 (C.M.A.1979). Moreover, this Manual provision does not create a shield for a convening authority which permits him to ignore his responsibilities under Article 6(b), UCMJ, 10 U.S.C. § 806(b). Such technical preoccupation with this provision of the Manual for Courts-Martial obfuscates the express dictates of Congress and the general intentions of the President as Commander in Chief that the service member be afforded due process of law in the military justice system.[9]

## II

*Limiting ourselves to the findings of fact by the trial judge*, we can assess the merits of petitioner's claim that his command's staff judge advocate denied him due process of law. *See* Article 67(d), UCMJ, 10 U.S.C. § 867(d).

■ The Staff Judge Advocate of the Strategic Air Command is a senior officer in the Air Force and chief legal counsel for the Commander in Chief of the Strategic Air Command. As command staff judge advocate, he was responsible for providing this general court-martial convening authority with competent and effective legal advice in all matters relating to military justice. *See* Article 6(b).[10] In view of the history of justice in the military,[11] such legal advice not only benefits the convening authority, but the military accused as well. *See United States v. DeAngelis,* 3 U.S.C. M.A. 298, 305, 12 C.M.R. 54, 61 (1953). Moreover, as an attorney, his performance in the execution of this codal responsibility must be guided by those standards of professional conduct applicable to the particular command function he is ordered to execute. *See generally United States v. Hardin, supra*; paras. 1–10, 1–11, 2–8, 3–4c of the Military Justice Guide, AFM 111–1 (2 July 1973).

In view of the findings of the trial judge, it is uncontroverted that the staff judge advocate was the "legal spokesman" for the command in the investigation of petitioner.[12] Not only did the commander rely on his staff judge advocate for all legal action in connection with this case but the agents of the Office of Special Investigations

**9.** The decisions of this Court in *United States v. Joseph,* 11 M.J. 333 (C.M.A.1981); *United States v. Caliendo,* 13 U.S.C.M.A. 405, 32 C.M.R. 405 (1962); *United States v. Thompson,* 11 U.S.C.M.A. 252, 29 C.M.R. 68 (1960), and *United States v. Werthman,* 5 U.S.C.M.A. 440, 18 C.M.R. 64 (1955), are not controlling in the present case. These cases did not address prosecutorial conduct by a general court-martial convening authority and his staff judge advocate nor their responsibilities under Article 6(b), UCMJ, 10 U.S.C. § 806(b).

**10.** *See* Hearings Before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., on H.R.2498 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice pp. 898–901.

*See also* Subcommittee Hearing on H.R.2575, to Amend the Articles of War to Improve the Administration of Military Justice, to Provide for More Effective Appellate Review, to Insure the Equalization of Sentences and For Other Purposes, 80th Cong., 1st Sess., p. 2066 (April 21, 1947).

**11.** *See generally* Brown, *Crowder-Ansell Dispute: The Emergence of General Samuel T. Ansell,* 35 Mil.L.Rev. 1 (1967); Morgan, *The Background of the Uniform Code of Military Justice,* 28 Mil.L.Rev. 17 (1965).

**12.** Finding 3.

(OSI), petitioner and later his counsel did so as well. In view of Article 6(b) and paragraph 35*b*, Manual, *supra*, this reliance was reasonable and proper for all the parties to the investigation.

The trial judge also found as a matter of fact that, consistent with the SAC commander's order of May 5, 1981, the staff judge advocate intended to conduct this investigation "in a manner consistent with potential prosecution," but "damage assessment was the immediate priority." [13] Problems arose in this case because all of the parties justifiably relied on the staff judge advocate to lawfully coordinate these two distinct aspects of the investigation.

The first coordination problem occurred when the staff judge advocate "reluctantly agreed" [14] to approve the interrogation of petitioner without advising him of his rights under Article 31, UCMJ, 10 U.S.C. § 831. This occurred on May 5, 1981, at the request of the OSI officials prior to petitioner's making any statements concerning his involvement in the suspected offenses. A misunderstanding developed between OSI agents and the staff judge advocate over the import of such procedure on the future prosecution of petitioner by the command. The trial judge found that these agents, during the subsequent interrogation, gave "assurances" to petitioner "regarding no prosecution." He also found that neither the staff judge advocate, the commander nor any other official of the command had indicated that the command still did not wish to prosecute petitioner. Accordingly, he found the assurances of the OSI agents "were not authorized." [15]

*The question unanswered by the trial judge is whose responsibility was it to insure this investigation would be conducted in a fair and orderly fashion in accordance with command's prosecutorial interests?* As a matter of fact, the trial judge earlier found that the staff judge advocate was "a

main point of contact between the" [16] command and the OSI in this investigation. As a matter of law, the Supreme Court has said, with respect to orderly prosecutorial procedures:

> The staff lawyers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done.

*Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). The staff judge advocate clearly failed at this point to provide for the fair and orderly prosecution of petitioner. The largely exculpatory statement of May 7, 1981, was induced by this government confusion.

The second "misunderstanding" in this case between the staff judge advocate and the OSI agents occurred on May 8, 1981. It concerned "an understanding" between this staff judge advocate and the OSI legal adviser "that if . . . [petitioner] would submit to and pass a polygraph, he would be favorably recommended by SAC for an honorable discharge." This understanding was in response to a seventeen-page statement made by petitioner on May 7, 1981, and a three-page document executed on the same day in which petitioner stated the conditions under which he would submit to such an examination. Both Headquarters OSI and Headquarters SAC had copies of these statements.

The trial judge found that the staff judge advocate believed that the OSI "polygraph examination [would be] limited to the validation of" petitioner's largely exculpatory statement of May 7. The trial judge also found that the OSI personnel believed "that the proposed polygraph examination related to any and all future disclosures." [17] The OSI position was adopted by the agents in the field. Petitioner was ultimately told that SAC would still "permit a polygraph examination after full disclosure and if . . .

13. Finding 5.

14. Finding 7.

15. Finding 9.

16. Finding 3.

17. Finding 12.

[he] passed the test, he would be permitted to resign."[18]

Petitioner did not accept this proposed agreement. The trial judge's findings, however, reenforce our earlier conclusion that the staff judge advocate had not taken adequate steps to protect the legitimate prosecutorial interest of his command.

The third misunderstanding occurred on May 9, 1981. The staff judge advocate was informed of petitioner's refusal to take the polygraph examination. Petitioner was then advised of his rights under Article 31 and he asserted his right to counsel. Captain Francis W. Pedrotty, III, was detailed as his military defense counsel. The OSI agent informed Captain Pedrotty "that his client had full immunity from prosecution if he would make full disclosures regarding his involvement with Soviet representatives" and he passed "a polygraph examination."[19]

Captain Pedrotty insisted that "the agreement [be] in writing."[20] The staff judge advocate was contacted by telephone. The trial judge found that during this telephone conversation on May 9, 1981, "General Teagarden, regardless of what he may have intended, did communicate to Captain Pedrotty and Lt. Colonel Hoffman, that if the accused made a full disclosure, took and passed a polygraph, he would be discharged and there would be no prosecution." He also found "that ... General Teagarden declined to authorize a written, signed agreement."[21]

 Regardless of the reasons posited by the trial judge for the staff judge advocate's conduct, it clearly was not in accordance with accepted standards of performance of the prosecutorial function. The staff judge advocate's offer must be viewed in light of the trial judge's finding that "General Ellis never authorized any agreement except that which pertained to the May 7 statement."[22] Section 4.1(c) of ABA Standards, The Prosecution Function (1971), states:

> It is unprofessional conduct for a prosecutor knowingly to make false statements or representations in the course of plea discussions with defense counsel or the accused.

The fact that the staff judge advocate had no reason to believe disclosures other than those contained in the May 7 statement would be forthcoming is no reason for him to make promises to the petitioner not authorized by the commanding general. Moreover, even if his conduct is not characterized as deliberate deception, he still had the duty to act with due care in these negotiations. Section 4.3(b) of the ABA Standards, *supra*, states:

> A prosecutor should avoid implying a greater power to influence the disposition of a case than he possesses.

The staff judge advocate had both the means and the responsibility to directly communicate with the SAC commander. *See* Article 6(b). His failure to do so served neither the convening authority's nor petitioner's legitimate interests in the orderly prosecution of this case.

The final aspect of the staff judge advocate's conduct in this case, which must be assessed in due-process terms, entails his failure to act after the evening of May 9, 1981. The trial judge found as a fact that petitioner, in reliance on the staff judge advocate's earlier communications to his counsel, "began to make disclosures distinct from and beyond those previously made."[23] These disclosures were communicated to command headquarters. A damage assessment team was sent by SAC to Langley Air Force Base to assist in the interrogation of petitioner. The staff judge advocate assisted in making arrangements for this team and was informed that petitioner had not been advised of his rights under Article 31.

18. Finding 14.

19. Finding 15.

20. Finding 16.

21. Finding 17.

22. Finding 18a.

23. Finding 20.

A senior judge advocate for a major command should know that a serious problem existed if the commander intended to prosecute petitioner on the basis of these additional disclosures. *See* Article 31(d). Moreover, in view of his past involvement in the case and his personal belief as to the scope of the agreement, questions should arise in his mind as to the reason petitioner, on advice of counsel, gratuitously made these additional disclosures and cooperated with the OSI investigators. No action was taken at this time by him to assure his command could still lawfully prosecute petitioner.

Further notice was given to the staff judge advocate, as the legal representative of the command, that the investigation of petitioner was not being conducted in accordance with the orders of his commander. The trial judge found that "a progress report" message prepared by the OSI and sent to the SAC commander on May 11, 1981, "constitute[d] notice to . . . [the command] of the possible existence of an agreement beyond that relating to the 7 May statement of" petitioner.[24] On this same day or the next day, the SAC deputy staff judge advocate informed the acting SAC commander, in the commander's absence, "that OSI was talking in terms of a grant of immunity to the accused." On May 13, 1981, SAC, in response to a message prepared by the deputy staff judge advocate, received from OSI a detailed statement of the terms of agreement it believed existed with petitioner. Regarding any response of the staff judge advocate, the trial judge found:[25]

No reply was forthcoming from SAC to the accused, to his counsel, or to the AFOSI agents . . . denying the existence of the agreement or contesting any of its terms.

Petitioner then executed a written statement concerning his additional disclosures on May 17, 1981. Still no word from the staff judge advocate. On May 19, 1981, the staff judge advocate attended meetings in Washington with several senior officers in the Judge Advocate General's office and the OSI where the prosecution of petitioner was discussed in terms of his agreement as detailed by the OSI. Moreover, during this time both "General Teagarden and General Ellis were aware that the . . . [petitioner] was to be polygraphed commencing 20 May, on the truthfulness of all disclosures made since 9 May."[26] Still no word or action by the staff judge advocate.

In assessing the conduct of the staff judge advocate, we note that the ABA Standards, The Prosecution Function § 4.3(c), states:

If the prosecutor finds he is unable to fulfill an understanding previously agreed upon in plea discussions, he should give notice promptly to the defendant and cooperate in securing leave of the court for the defendant to withdraw any plea and take other steps appropriate to restore the defendant to the position he was in before the understanding was reached or plea made.

A failure to meet this minimum standard of professional conduct is indisputable in this case.

 This conduct by the staff judge advocate is not appropriate in the plea-bargaining process in the military justice system. *United States v. Andreason*, 23 U.S.C.M.A. 25, 28, 48 C.M.R. 399, 402 (1974); *United States v. Cox*, 22 U.S.C.M.A. 69, 71, 46 C.M.R. 69, 71 (1972); *see generally United States v. Dawson*, 10 M.J. 142 (C.M.A. 1981) (Fletcher, J.). Here, the staff judge advocate, by his own words, created a reasonable expectation in petitioner that if he satisfactorily cooperated with the command in the matters concerning national security, there would be no court-martial prosecution by military authorities. *See Santobello v. New York, supra.* More importantly, with notice of possible confusion as to the terms of this understanding, he failed to act to clarify the situation. As a result, he repeatedly reenforced petitioner's and the

24. Finding 23.

25. Finding 24.

26. Finding 31.

OSI agents' view of the agreement and continued to accept the benefit of petitioner's ongoing performance. *Cf. United States v. Kazena,* 11 M.J. 28 (C.M.A.1981). Such tactics were indeed successful in producing for the command a verified account of the compromised national security information. We believe, however, that although an accused may have to make many difficult decisions in the criminal justice system (*Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)), he need not gamble on the integrity of prosecutorial authorities in the military justice system. *United States v. Kazena, supra* at 31; *United States v. Hardin, supra.* In view of this minimum standard for professional conduct,[27] the codal importance of a staff judge advocate in the military justice system, and the earlier pronouncements of this Court and others [28] concerning fairness in the plea-agreement area, we conclude that in this case there was a violation of due process of law.

### III

The staff judge advocate of this command was not the only prosecutorial authority involved in the investigation of petitioner. *See* Article 6(b). Due process challenges were also made to the conduct of the SAC commander as the original convening authority in this case. The facts found by the trial judge also demonstrate with unmistakable clarity the unfairness of his conduct in bringing petitioner to court-martial.

The judge's findings indicate that in the latter part of April 1981 the SAC commander was informed by the OSI of its "suspicions concerning" [29] certain activities of petitioner. The SAC commander was clearly responsible for the security of defense information within his command and the negation of any damage caused by a breach of this security. As a response to this threat, he designated his staff judge advocate to represent the command in legal matters involved in the OSI investigation. After a later briefing by his staff judge advocate concerning petitioner on May 5, 1981, he ordered his lawyer to direct "the OSI to 'pick him up immediately—we must find out what damage he has done to the country.'" Such conduct was consistent with his command responsibilities.

The SAC commander is also responsible for maintenance of law and order within his command and the effective enforcement of federal criminal law. *See Relford v. Commandant,* 401 U.S. 355, 367, 91 S.Ct. 649, 656, 28 L.Ed.2d 102 (1971). The military judge found that the details of his order as actually communicated to the OSI evidenced the state of mind of the command "that though damage assessment was the immediate priority, the investigation was to be conducted in a manner consistent with potential prosecution." [30] In view of his broad responsibility and prosecutorial discretion, this concern was also legitimate. *See generally* Hodson, *Military Justice: Abolish or Change?* Mil.L.Rev., Bicentennial Issue, 579, 591–97 (1975).

At this point, a serious problem confronted the commander in his dual role of commanding officer and general court-martial convening authority. What procedures of investigation could he employ which would resolve with certainty his concern for national security, yet, at the same time, per-

---

27. *See* ABA Standards, The Prosecutorial Function § 1.1(e) (Supplement) (1971). *See also Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

28. We have reviewed the federal cases cited by petitioner and the Government concerning due process requirements for federal prosecuting attorneys. *E.g., Government of the Virgin Islands v. Scotland,* 614 F.2d 360 (3rd Cir. 1980); *Cooper v. United States,* 594 F.2d 12 (4th Cir. 1979); *Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286, 294–96 (2nd Cir. 1976), *cert. denied,* 431 U.S. 911, 97 S.Ct. 2166, 53

L.Ed.2d 221 (1977); *United States v. Carter,* 454 F.2d 426, 427–28 (4th Cir. 1972), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974). *See also Rowe v. Griffin,* 497 F.Supp. 610, 617 (M.D.Ala.1980); *United States v. Paiva,* 294 F.Supp. 742, 747 (D.D.C.1969). We fail to find any support for such prosecutorial conduct in those cases.

29. Finding 4.

30. Finding 5.

mit him to successfully prosecute petitioner at a court-martial for any offenses he might have committed? Such a predicament is admittedly difficult. However, the Uniform Code of Military Justice provided this convening authority with the necessary legal guidance to resolve this dilemma. Article 6(b) states in part:

Convening authorities shall at all times communicate directly with their staff judge advocates or legal officers in matters relating to the administration of military justice.

As indicated earlier, this codal provision also protects the military accused from prosecutorial conduct by a convening authority which is not based on competent legal advice. See Article 34(a), UCMJ, 10 U.S.C. § 834(a); Hodson, supra. As a matter of law, Congress mandated the orderly procedures by which a commander might competently and successfully prosecute petitioner. See United States v. Hardin, supra; McMenamin, Plea Bargaining in the Military, 10 Am.Crim.L.Rev. 93, 99–102 (1971).

Turning to the facts in this case as found by the trial judge, it is necessary to determine whether petitioner was prosecuted in an orderly and legally fair manner as contemplated by the Uniform Code of Military Justice. See Santobello v. New York, supra, 404 U.S. at 261–63, 92 S.Ct. at 498. The trial judge placed great weight in his legal decision on the fact that at the critical points in the investigation, where prosecutorial decisions where made by the staff judge advocate and the OSI agents, the SAC commander remained silent as to his intentions. Moreover, such silence continued even though, on May 9, 1981, he knew there were additional disclosures after petitioner's exculpatory statement of May 7, 1981;[31] after he had notice on May 11, 1981, from the OSI progress report "of the possible existence of an agreement beyond that relating to the 7 May 1981 statement"[32]; and after he was fully briefed on May 15, 1981, by his deputy on the problem concerning the OSI grant of immunity to petitioner.[33]

His only response was to direct his second-in-command to brief his staff judge advocate on the problem of the OSI grant of immunity to petitioner. A review of the legislative history of Article 6(b) and Article of War 47(a), its statutory predecessor,[34] reveals that this was the precise method of proceeding which Congress intended to stop. Congress instead mandated that the convening authority, at all times in matters of military justice, communicate directly with his staff judge advocate without intervention of other staff personnel.

As a result of the repeated failure of the commander to act during this period and the unrepudiated conduct of his legal representative, petitioner executed a written statement on May 17, 1981, as to his additional disclosures since May 9, 1981. Notice was given to the SAC commander by May 19, 1981, that petitioner "was to be polygraphed" on his additional disclosures.[35] Still he did not act. Petitioner, in reliance on this continuing course of conduct by the convening authority, submitted to a polygraph examination between May 20 and 22, 1981. By noon on May 22, 1981, the results were known. It was the professional opinion of the Air Force examiners that petitioner had passed the examination.

According to the trial judge, it was sometime thereafter that the command announced to the parties to the investigation that it intended to prosecute petitioner. The first reason offered for such action was that petitioner "had not [satisfactorily] passed the polygraph examination," in the opinion of the command.[36] Later, it was maintained that the agreement with peti-

31. Finding 20.

32. Finding 23.

33. Finding 27.

34. See n. 10

35. Finding 31.

36. Finding 33.

tioner never extended to additional disclosures outside the May 7 statement.[37]

■ Such conduct by a commander-general court-martial convening authority was in violation of the orderly prosecutorial procedures prescribed in Article 6(b). *See Santobello v. New York, supra.* Rather than directly communicating with his staff judge advocate in this military justice matter, he chose to isolate himself from the continuing investigation of petitioner. This codal provision was not intended to functionally relieve the commander of his prosecutorial responsibilities. *See United States v. Hardin, supra; United States v. DeAngelis, supra.* Moreover, his earlier delegation of authority to his legal counsel could not conceivably justify his decision to stand silent in the face of repeated notice that his orders concerning the investigation were not being carried out. Article 6(b) cannot reasonably be read to permit such selective abdication of prosecutorial responsibility by the convening authority.

## IV

■ The final question we must address in this case concerns the remedy to be afforded petitioner as a result of the due process violations in this case. As the Supreme Court pointed out in *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation [of the fifth amendment] may have been deliberate." *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a). Although we accept this statement as a general principle of law, it does not preclude the more drastic action in the present case.[38] 449 U.S. at 365 n. 2, 101 S.Ct. at 668 n. 2.

In any event, the usual approach adopted by the Supreme Court in fashioning a constitutional remedy is "to identify" the taint in the criminal proceeding and "neutralize" it "by tailoring relief appropriate in the circumstances to assure the defendant" due process of law "and a fair trial." *United States v. Morrison, supra* at 365, 101 S.Ct. at 668. In other words, "[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." *Id.* at 366, 101 S.Ct. at 669.

The trial judge opined that the detriment suffered by petitioner was the confession he made to the OSI agents as a result of the defective promises of immunity. He suggested if a timely motion to suppress were filed, the appropriate remedy in this case would be to suppress these statements and any evidence derived therefrom. The problem with this suggestion is that it ignores his earlier findings of fact that petitioner was not properly advised of his rights under Article 31(b) by the OSI agents prior to his original or additional disclosures. These statements were inadmissible for this reason without regard to the conduct of the convening authority and his staff judge advocate. Article 31(d), *supra.*

■ The question becomes what are the fruits of the prosecution's transgressions in the present case? First, the commander acquired the verified national security information which was compromised by petitioner. It would be absurd to suggest that this Court return these materials to petitioner, or that such action would be meaningful. Second, military authorities acquired a confession from petitioner as to his involvement in these offenses. As indicated above, suppression is not an appropriate remedy under the circumstances in this case. The third fruit of the prosecution's transgression, at least in the mind of the trial judge, was that military authorities retained the right to prosecute the petition-

---

37. Finding 38.

38. We agree wholeheartedly with the Supreme Court that our society has a strong interest in the effective administration of criminal law. Prosecution of the petitioner under the circumstances of the present case, though serving this interest, would clearly discourage cooperation by suspected spies or traitors in future damage-assessment investigations. *See Cooke v. Ellis,* 12 M.J. 17, 18 (C.M.A.1981) (Everett, C. J., dissenting).

er. In our mind, this is also the continuing prejudice suffered by petitioner as a result of the actions of the convening authority and his staff judge advocate. *Cf. United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). Accordingly, we believe the appropriate remedy is to deny military authorities this right to prosecute petitioner by court-martial.[39]

The extraordinary relief sought by petitioner is granted. The record shall be returned to the respondent military judge who is directed forthwith to dismiss the charges and specifications.

## APPENDIX

| | |
|---|---|
| UNITED STATES | ) |
| | ) MEMORANDUM OF RULING ON |
| v | ) DEFENSE MOTION TO BAR |
| | ) PROSECUTION: PROMISE OF |
| 2LT CHRISTOPHER M. COOKE, FV225–84–8325 | ) IMMUNITY |
| 532d Strategic Missile Squadron (SAC) | ) |
| McConnell Air Force Base, Kansas | ) |

### I.

This motion presents for resolution the issue of whether trial of this case is barred in consequence of a promise of immunity from prosecution made to the accused, 2Lt Christopher M. Cooke.

### II.

Upon careful consideration of all the evidence bearing on the motion, together with the briefs and arguments of counsel, having seen and heard the witnesses, and mindful of the burden on the defense to support their position by a preponderance of the evidence, it is the decision of the court that the motion is denied.

### III.

In connection with this disposition, the court finds as follows regarding the facts and law relevant to the motion:

1. General Richard H. Ellis, Commander in Chief of Strategic Air Command (CINCSAC) and the General Court-Martial Convening Authority, did not promise or grant accused immunity from prosecution at any time; nor did he authorize Brigadier General C. Claude Teagarden, his Staff Judge Advocate, or anyone else to make any such promise or grant in his behalf.

2. At no time did General Ellis, in his capacity as General Court-Martial Convening Authority, ratify any alleged promise of immunity or no prosecution offered accused by any person purporting to act pursuant to lawful authority.

a. As a matter of law, ratification of such an alleged promise of immunity or no prosecution must be done by one who has actual authority. In addition, such ratification must be done by affirmative action and may not be done by silence. Equitable immunity or estoppel may not be granted in the absence of actual authority.

3. Beginning on 27 April 1981, Brigadier General Teagarden acted as a main point of contact between the Air Force Office of Special Investigations (OSI) and CINCSAC involving the investigation of Lieutenant Cooke. General Teagarden had actual and apparent authority to act as CINCSAC's legal spokesman on the Cooke investigation, and General Ellis, then CINCSAC, and Major General Pringle, Strategic Air Command (SAC) Chief of Staff, expressly relied upon General Teagarden for all legal action in connection with this case.

4. In the last days of April 1981, SAC was informed by the OSI of suspicions con-

---

**39.** This Court has no jurisdiction over the administrative discharge system of the armed services. Moreover, in view of the basis of our decision, we offer no comments as to the ability of federal civilian authorities to try petitioner in federal district court.

cerning the accused. Despite the OSI recommendation that the accused be prohibited from going on a scheduled leave on 2 May 1981, SAC decided that the accused should in fact be permitted to go on leave and kept under surveillance.

5. After General Teagarden briefed the CINCSAC about the accused on 5 May 1981, General Ellis ordered General Teagarden to inform the OSI to "pick him up immediately—we must find out what damage he has done to the country." That order as communicated to OSI through Generals Pringle and Teagarden, was: Pick up accused off the street immediately, advise him of his rights and question him, reinterview the cab driver and obtain a written statement, and interview the uniformed policemen at the Soviet Embassy and obtain written statements. The order evidenced the state of mind of Generals Ellis, Pringle, and Teagarden that though damage assessment was the immediate priority, the investigation was to be conducted in a manner consistent with potential prosecution.

6. On 5 May 1981, pursuant to orders from SAC, the accused was taken into custody by OSI special agents as a result of suspicions that he had engaged in unauthorized visits to the Embassy of the Soviet Union in Washington, D. C. He was taken to Langley Air Force Base, Virginia, for interrogation.

7. Later that same day, General Teagarden was contacted by Major Snyder, OSI Legal Advisor, and by Colonel Grosvenor H. LeTarte, Director of the USAF Judiciary, at the behest of OSI Headquarters. They advised the General that if SAC's primary purpose was to obtain damage assessment, the recommended procedure was to interview the accused without an advisement of rights pursuant to Article 31, UCMJ. Colonel LeTarte told General Teagarden that an OSI regulation required approval of the Staff Judge Advocate before OSI could proceed with a non-advisement of rights interview. General Teagarden reluctantly agreed that the interview of the accused could be conducted without an advisement

of his Article 31 rights. At no time did General Teagarden or any other SAC official indicate in any manner that SAC did not wish to prosecute the accused or that SAC's only interest was in ascertaining what the accused had done. Aside from the non-advisement of rights, OSI did not request approval from General Teagarden to conduct the investigation in a manner different from SAC's initial direction.

8. Thereafter, but still on 5 May 1981, Colonel LeTarte informed Mr. Charles Torpy, the then Acting Chief of the Directorate of Counterintelligence, Headquarters AFOSI, that General Teagarden concurred in the OSI request for a non-advisement interview of the accused on the basis of SAC's desire to obtain a damage assessment. Colonel LeTarte did not tell Mr. Torpy that SAC was not interested in prosecuting the accused. Mr. Torpy thereafter, without further coordination with SAC, advised Lt Colonel Jerome E. Hoffman telephonically that SAC was not interested in prosecuting the accused and to proceed with a non-advisement interrogation.

9. Pursuant to the foregoing understanding of SAC's desire to obtain damage limiting information, the OSI investigators interrogated the accused for approximately four days from 5 through 8 May 1981, without counsel and without an Article 31 advisement. Lt Colonel Hoffman and other special agents interrogating the accused repeatedly informed him the reason for not advising him of his Article 31 rights was because the purpose of the investigation was not prosecution but rather, to ascertain possible damage to SAC's operational capability. The assurances given to the accused regarding no prosecution were not authorized by or known to General Ellis or any other official of SAC.

10. On 7 May 1981, a seventeen-page statement was reduced to writing and signed by the accused (See Defense Exhibit C). The statement was to a large extent exculpatory in nature. In that connection, it is noted that between 5 and 8 May, Lt Colonel Hoffman and other agents involved in the questioning of the accused became

increasingly doubtful that the accused's original story and his seventeen-page 7 May statement revealed the total extent of his involvement with the Soviets. Mr. Hoffman repeatedly apprised HQ OSI of his growing apprehension, however, such apprehension was never communicated to SAC officials.

11. Although at the commencement of his interrogation, the accused had expressed a willingness to submit to a polygraph examination, he evidenced an increasing reluctance to do so when the issue became the verification of his 7 May statement. Eventually the accused prepared a three-page document on 7 May relating his concerns about taking a polygraph examination and setting forth conditions under which he would approve such an examination. (See Defense Exhibit D.) One of the accused's major concerns was that any misreading of the polygraph would be used against him by SAC. He therefore requested discharge from the Air Force before being examined. That document and the seventeen-page, 7 May statement were transmitted to OSI Headquarters and, on 8 May 1981, to SAC Headquarters at Offutt Air Force Base, Nebraska.

12. After having had an opportunity to review Defense Exhibits C and D, General Teagarden, at the request of Colonel Beyea, OSI Commander, had a telephone conversation with Colonel Beyea, Major Snyder, and Mr. Torpy at OSI Headquarters. Colonel Gilbertson was on the line with General Teagarden at the General's residence. This conversation focused on the concerns expressed by the accused regarding his submitting to a polygraph examination while under SAC's control and how these concerns could be alleviated. The discussion was primarily between General Teagarden and Major Snyder and resulted in an understanding that if the accused would submit to and pass a polygraph, he would be favorably recommended by SAC for an honorable discharge. It is evident that this conversation resulted in a misunderstanding between SAC and OSI officials. General Teagarden's understanding was that OSI in-

tended to conduct a polygraph examination limited to the validation of the accused's seventeen-page 7 May statement detailing the extent of his involvement with the Soviets. Conversely, Major Snyder and other OSI personnel were under the impression that the proposed polygraph examination related to any and all future disclosures the accused might make. During the conversation nothing was said by any of the OSI officials that should reasonably have alerted General Teagarden to any real possibility that the accused's 7 May statement was anything less than a definitive account of his involvement with the Soviets. In fact, Mr. Torpy who described himself as a rather passive party to the conversation and had no clear recollection of the specifics, did express the view, in effect, that what we have here may be just what it appears to be, a young, naive student following up his academic pursuits; that spies just don't walk in the front door of the Soviet Embassy.

13. A short time after the telephone conversation, Major Snyder believing he had the basis for an agreement, drafted a handwritten outline of the conditions discussed by General Teagarden on the telephone. The text of this outline was then transmitted telephonically to Lt Colonel Hoffman who, in turn, typed it out in verbatim fashion (with the exception of paragraph 4c) and labelled the document "SAC Position." (See Defense Exhibit A.)

14. During the morning hours of 9 May 1981, Lt Colonel Hoffman began to explain to the accused his understanding of SAC's Position. Prosecution Exhibits 5 and 6 are verbatim transcripts of the interview. Hoffman's explanation of the SAC position during the initial phase of the interview conforms to Defense Exhibit A. Among other things, Lt Colonel Hoffman told the accused, "If you have in your mind doubts about what you've told us as far as the accuracy and the truthfulness, stay the hell off the machine because it's not going to help you any. The option of being deception indicated and the option of not taking are the same. If you're not being truthful,

if you haven't been accurate, tell us right now, you know, 'I don't want to take the machine,' you know, to be examined, the appearance that it will be, because you are just going to bugger things up even more." For the first forty minutes of the interview, the focus was on the accused taking a polygraph examination on the 7 May statement. Finally, Hoffman stated, "Now we need a decision." After a lengthy pause, SA Hoffman indicated to the accused that Option 3 on Defense Exhibit A applied even if the accused had been deeply involved in espionage for many years and had been guilty of extensive compromises, provided he made full disclosure and then submitted to and passed a polygraph examination. He said "they," meaning SAC, were still willing to permit a polygraph examination after full disclosure and if the accused passed the test, he would be permitted to resign. The accused's response to being told that this new explanation was what was written on the exhibit was, "I've got what's written down here. What you just said is something very ___ incredible. Not that I care about that at all, but if it's so clear, why didn't I ___ why didn't I surmise that for myself from reading this?" The explanation by Lt Colonel Hoffman was a significant departure from his original explanation of the meaning of SAC's position and was recognized by the accused as being quite different.

15. Despite the foregoing, the accused remained reluctant to submit to a polygraph examination. This reluctance was communicated to General Teagarden by OSI Headquarters. Ultimately, the accused refused to take the polygraph and was accordingly advised of his rights under Article 31. Pursuant to the accused's assertion of his right to counsel, Captain Francis W. Pedrotty, III, was detailed as his military defense counsel. Captain Pedrotty was briefed by Lt Colonel Hoffman that his client had full immunity from prosecution if he would make full disclosures regarding his involvement with Soviet representatives, provided such information was verified by the accused passing a polygraph examination. Lt Colonel Hoffman also ad-

vised Captain Pedrotty that this agreement was authorized by SAC, and if all conditions were met, the accused would be administratively separated from the Air Force with an honorable discharge. Insofar as these statements gave assurances regarding future disclosures to be made by the accused, these statements regarding no prosecution went beyond any authorization by SAC officials.

16. Captain Pedrotty, after consulting with the accused, determined there was a lot more involved than what was contained in the 7 May statement. He informed the special agents that he and his client wanted the agreement in writing. Lt Colonel Hoffman advised that authority for that would have to come from SAC. Thereafter, on the afternoon of 9 May 1981, a telephone call was placed to General Teagarden with both Captain Pedrotty and Lt Colonel Hoffman on separate extensions of the same phone line. In consequence of that telephone conversation and a subsequent one between General Teagarden and Lt Colonel Hoffman, a short time later, Captain Pedrotty and Lt Colonel Hoffman believed that General Teagarden, with the asserted explicit backing of CINCSAC, authorized immunity for the accused if he would make full disclosure regarding his involvement with the Soviets and successfully complete a polygraph examination. As a result of these same conversations, General Teagarden believed the accused had agreed to take a polygraph examination as to his 7 May statement only. He further understood that if the accused had been truthful and fully forthcoming in that statement, and if the accuracy of that statement were verified by the accused passing the polygraph examination, SAC would allow the accused to return to Richmond, Virginia, in leave status and thereafter be separated administratively from the Air Force with a recommendation for an honorable discharge.

17. The evidence is in sharp dispute concerning what was actually communicated by General Teagarden to Captain Pedrotty, and thus to the accused, during the 9 May telephone conversations. In their testimo-

ny, the parties were adamant that their respective accounts actually reflected the parameters of the agreement. However, having considered the testimony and the factors bearing thereon, including Lt Colonel Hoffman's memorandum on the reverse side of Defense Exhibit A, I find as fact that General Teagarden, regardless of what he may have intended, did communicate to Captain Pedrotty and Lt Colonel Hoffman, that if the accused made a full disclosure, took and passed a polygraph, he would be discharged and there would be no prosecution. I further find that during the conversations General Teagarden declined to authorize a written, signed agreement and displayed increasing impatience to the callers. Clearly the accused relied on such promise to his detriment.

18. A key to why General Teagarden would make such a promise may be discerned in previous findings. As indicated, what was known by the parties to the telephone calls was decidedly different. Thus, except for a slight personal uneasiness he felt concerning the truth of the 7 May statement, General Teagarden had no reason to believe on the basis of anything communicated by the OSI that the statement was not a definitive account of the accused's involvement with the Soviets. By contrast, Lt Colonel Hoffman and Captain Pedrotty both believed there was a substantial probability that the accused had been less than candid in his 7 May statement and that disclosures of serious espionage activity would be forthcoming. On the basis of this disparity, and in light of General Teagarden's conduct before and after the telephone conversations, I do not believe he meant the agreement to be so all encompassing. Nevertheless, his words conveyed that message.

a. Of greater import, General Ellis never authorized any agreement except that which pertained to the 7 May statement. Nor did he at any time ratify the agreement not to prosecute the accused believed he had as a result of the 9 May conversations between his counsel and General Teagarden.

19. Early on 9 May 1981, before any of the telephone discussions between General Teagarden, Captain Pedrotty, and Lt Colonel Hoffman, General Teagarden informed General James Taylor, Deputy, TJAG, that "We may have an officer involved in an espionage case." That statement, either in and of itself or when considered with all the other evidence in the case, is no indication of General Teagarden's disbelief of the 7 May statement of the accused.

20. As a result of the agreement he believed he had with CINCSAC, in consequence of the 9 May telephone conversations between General Teagarden, Captain Pedrotty, and Lt Colonel Hoffman, on the evening of 9 May 1981, the accused began to make disclosures, distinct from and beyond those previously made. These disclosures were made pursuant to an express revocation of the previous advisement of rights. The accused's disclosures were communicated to AFOSI Headquarters and to SAC. A SAC damage assessment team was formed and subsequently sent to Langley Air Force Base to assist in the interrogation of the accused.

21. On the morning of 10 May 1981, General Teagarden had a telephone conversation with Colonel Beyea in which arrangements for the SAC damage assessment team were discussed. During this conversation General Teagarden expressed the hope that the accused had been advised of his Article 31 rights before the statement was made and was informed that he had not been.

22. Also on the morning of 10 May 1981, General Ellis, by message, which was reviewed by Generals Pringle and Teagarden, notified the Chairman of the Joint Chiefs of Staff and the Air Force Chief of Staff, of his intention to prosecute the accused to the fullest extent of the law. A copy of the message was sent to Lt General Lloyd Leavitt, the then Vice CINCSAC. Prior to going TDY to WestPac, General Ellis advised General Leavitt to keep him informed of developments in the Cooke case. It is not implicit in the message that General Ellis understood there was an agreement

that the accused would take a polygraph examination on the truthfulness of all disclosures. General Ellis' message does acknowledge his understanding of the inability to use the accused's confessions in contemplated prosecution.

23. On 11 May 1981, a progress report was transmitted from AFOSI Headquarters to AFOSI District 13 requesting through transmittal to CINCSAC at TDY site, which message states in pertinent part that the interrogation of the accused is continuing "under agreed upon conditions." (See Defense Exhibit O.) General Ellis admitted an awareness of at least part of the information contained in that message. This message did constitute notice to SAC of the possible existence of an agreement beyond that relating to the 7 May statement of the accused.

24. On 11 or 12 May 1981, General Leavitt was informed by Colonel Ratcliff, General Teagarden's Deputy SJA, that OSI was talking in terms of a grant of immunity to the accused. General Leavitt instructed Colonel Ratcliff to find out from AFOSI the events of 9 May relating to the immunity. A message was sent by Colonel Ratcliff to AFOSI Headquarters requesting said information which resulted in messages being sent to Special Agent Hoffman at Langley Air Force Base. (See Defense Exhibits B and B–1.) In response thereto, Special Agent Hoffman prepared a message (see Defense Exhibit B–2) which was received and reviewed by Colonel Ratcliff and General Leavitt. That 13 May message from Special Agent Hoffman sets out in precise detail, the terms of the agreement for no prosecution the OSI believed existed between the accused and SAC. No reply was forthcoming from SAC to the accused, to his counsel, or to the AFOSI agents conducting this investigation, denying the existence of the agreement or contesting any of its terms. However, I do not find this to be evidence of CINCSAC's assent to or ratification of the agreement.

25. On 11 through 17 May 1981, efforts were commenced in the office of TJAG, the Justice Department and the Joint Chiefs of Staff to determine whether there was a means to prosecute the accused despite the existence of an agreement not to prosecute.

26. On 13 May 1981, Mr. Torpy, Major Robert Mounts, then a member of TJAG's staff, and Colonel Allan C. Smith, Headquarters Air Force Trial Judiciary, Chief Judge, had a meeting with Mr. John L. Martin, Chief of the Internal Security Division of the Justice Department, his deputy and several FBI agents. Judge Smith and Major Mounts had been assigned by TJAG the task of examining possible ways to prosecute. Mr. Martin was informed that the AFOSI and TJAG were of the opinion that the case was non-prosecutable unless the accused ceased to cooperate or failed to pass the polygraph examination as evidenced by the 19 May Talking Paper (Defense Exhibit E). The Justice Department shared this view.

27. On the evening of 15 May, CINCSAC and his entourage returned from WestPac. Moments after his arrival, he was informed by General Leavitt of a problem concerning the agreement with the accused during which conversation General Leavitt may have said the "OSI gave immunity" to the accused. CINCSAC indicated no reaction of great concern. He asked General Leavitt to advise General Teagarden of the problem.

28. On 17 May 1981, the accused signed a written statement containing all of his disclosures up to the 17th of May concerning all of his contacts with and disclosures to the Soviets.

29. On 18 May 1981, there was a meeting at the office of Lt General Leaf, Air Force IG, attended by Generals Leaf and Thomas Bruton, Air Force TJAG, Colonel Beyea, Mr. Torpy, Major Mounts and other representatives of the AFOSI, the IG's office, Joint Chiefs of Staff and Secretary of the Air Force Personnel Council, during which the preparation of a talking paper was discussed. The talking paper was to include a discussion of legal options should the accused breach his agreement, as well as various personnel options.

30. On 19 May 1981, the talking paper having been prepared, an informal meeting took place at Major General Bruton's office and was attended by Generals Bruton, Taylor, and Teagarden, Colonel Beyea, Mr. Torpy, and Major Mounts. The talking paper unequivocally details the agreement not to prosecute as well as the opinion of all interested parties that the agreement should be honored. At no time during the meeting did General Teagarden claim that there was no agreement in existence, or that any agreement had been abrogated. Even more specifically, General Teagarden did not claim at this meeting that the only agreement was one predicated on the truthfulness of the accused's 7 May statement.

31. Subsequent meetings and conversations took place between General Teagarden, Mr. Torpy, and Generals Bruton and Taylor. Again, General Teagarden did not mention to anyone that the agreement of no prosecution was contingent on the truthfulness of the 7 May statement. Further, General Teagarden and General Ellis were aware that the accused was to be polygraphed commencing 20 May on the truthfulness of all disclosures made since 9 May.

32. On 20 through 22 May 1981, a polygraph examination of the accused was conducted by Air Force polygraph examiners James Suter and Gerald Craig. At mid-day on 22 May, said examiners reached the conclusion that the accused had made full disclosure and had verified the truthfulness of those disclosures by polygraph examination.

33. During the week of 22 May 1981, General Teagarden informed General Taylor that SAC was considering prosecuting the accused because he had not passed the polygraph examination. The OSI and Captain Pedrotty were also informed of this position. The accused was then ordered returned to McConnell Air Force Base for psychiatric evaluation despite the fact that arrangements were being made by the AFOSI for the release of the accused for continued leave in the Richmond area pursuant to the terms of the agreement.

34. On 22 May 1981, a meeting attended by Generals Bruton and Taylor and Mr. William Howard Taft, IV, DOD General Counsel, was held. During that meeting, Mr. Taft directed, on behalf of the Secretary of Defense, that, among other things, he be informed of the reasons, if any, for the abrogation of the agreement.

35. On 25 May 1981, a meeting was held at SAC Headquarters and was attended by Generals Ellis, Leavitt, Pringle and Teagarden. A response was prepared to Mr. Taft's directive. No mention was made in that response of the abrogation of an agreement based on the truthfulness of the accused's 7 May statement, or even the existence of such an agreement. A message was sent by CINCSAC to the Chairman of the Joint Chiefs of Staff, and Air Force Chief of Staff. (See Defense Exhibit G.) By approving paragraph 4 of that message, General Ellis did not intend to adopt or ratify any agreement with the accused. I believe his testimony when he stated he understood that "someone" obviously thought there was an agreement, and by paragraph 4 he intended only to assert that "regardless of whose agreement it was, it was invalid."

36. On 28 May 1981, Captain Pedrotty and General Teagarden had a telephone conversation wherein General Teagarden again did not inform the accused's counsel that SAC claimed the agreement with the accused was based on the 7 May statement.

37. On 7 June 1981, General Teagarden had a telephone conversation with Mr. F. Lee Bailey, civilian counsel for the accused. During that conversation General Teagarden did not mention SAC's contention that the agreement was predicated on the 7 May statement.

38. On 8 June 1981, General Teagarden, in a telephone conversation with General Bruton, later reported to General Taylor, first mentioned to some individual outside of his own Command, that the agreement of no prosecution which the accused was informed he had, was never entered into by SAC.

IV.

Although not technically necessary to resolution of the issue raised by this motion, I

nevertheless find it appropriate to add that the accused is not without a remedy to correct the detriment he has suffered in consequence of unauthorized promises of immunity which motivated his confession. In that regard, it is clear to the court that the statement the accused made and which was executed on 17 May 1981 was involuntary, in that it was obtained through the use of unlawful inducement; that is to say, an unauthorized, defective promise of immunity. Therefore, in the face of a timely motion to suppress, such statement may not be received as evidence against the accused during this trial. In addition, such evidence as is challenged as having been derived from such statement, so called derivative evidence, will suffer a similar fate, unless the government can demonstrate that said evidence was not obtained by use of the statement.

22 September 1981
(Date)

 /s/David Orser
 DAVID ORSER, Lt Colonel, USAF
 Military Judge

EVERETT, Chief Judge (concurring):

## I

The findings of fact by the military judge[1] and the evidence in the extensive record confirm what I had foreseen in my dissent from the denial of Lieutenant Cooke's previous petition for extraordinary relief. See Cooke v. Ellis, 12 M.J. 17, 18 (C.M.A.1981) (Everett, C. J., dissenting). Therefore, in my view, petitioner would be entitled to the requested relief without any need to go beyond the provisions of the Manual for Courts-Martial concerning grants and promises of immunity. See

1. The findings are set forth in an appendix to the principal opinion.

2. Commander in Chief, Strategic Air Command.

3. Finding 3.

4. In the *Merrill* case, the Supreme Court, by a five-to-four vote, held that the Federal Crop Insurance Corporation was not liable for the actions of its agents under circumstances when a private corporation would have been. How-

para. 68*h*, Manual for Courts-Martial, United States, 1969 (Revised edition).

The military judge found from overwhelming evidence that "[b]eginning on 27 April 1981, Brigadier General Teagarden . . . had actual and apparent authority to act as CINCSAC's[2] legal spokesman on the Cooke investigation, and General Ellis, then CINCSAC, and Major General Pringle, Strategic Air Command (SAC) Chief of Staff, expressly relied upon General Teagarden for all legal action in connection with this case."[3] In view of this finding and the relationship established by statute between the convening authority, General Ellis, and his staff judge advocate, General Teagarden, see Article 6(b), Uniform Code of Military Justice, 10 U.S.C. § 806(b)—a relationship to which the principal opinion properly directs attention—the actions of the staff judge advocate as "legal spokesman" must be imputed to his client. In this connection, I observe that paragraph 68*h*, Manual, *supra*, does not require that a grant or promise of immunity be in writing or be personally signed by the officer exercising general court-martial jurisdiction. Indeed, unlike the situation where a particular action is specifically precluded by a federal statute or regulation, cf. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947),[4] the Manual contains no explicit prohibition against a convening authority's delegation to his staff judge advocate of the power to negotiate a binding immunity grant, just as a district attorney might delegate such responsibility to a member of his staff. Also, it appears clear to me that, even though delegated authority may be insufficient to *sustain* action by the Government, cf. *Unit*-

ever, the Wheat Crop Regulations, on which the Government relied, not only limited liability but also had been specifically incorporated by reference in the application for crop insurance. Further, since the case arose in the context of a commercial transaction, its relevance in the administration of criminal justice is questionable. *See, e.g., People v. Reagan*, 395 Mich. 306, 235 N.W.2d 581, 585 (1975); *Workmen v. Commonwealth*, 580 S.W.2d 206 (Ky.1979).

ed States v. Kalscheuer, 11 M.J. 373 (C.M.A. 1981), under some circumstances action taken under delegated authority may be sufficient to *bind* the Government.

Of course, in the case at bar, General Ellis did not merely appoint General Teagarden to be his "legal spokesman" and then have no further contact with the investigation. According to General Teagarden's own unrefuted testimony, he and General Ellis on May 9 or 10 discussed an administrative separation for Cooke. Since such a separation would have terminated military jurisdiction, it was the "functional equivalent" of a promise of immunity under paragraph 68*h* of the Manual. Thus, General Ellis, on the basis of briefings by General Teagarden, made a personal judgment that, under some circumstances, full disclosure by Lieutenant Cooke would be more important than trying him by court-martial for violations of the Uniform Code; and he entrusted General Teagarden with working out the details. Accordingly—unlike some cases in which our Court has not recognized promises of immunity, *see, e.g., United States v. Werthman*, 5 U.S.C.M.A. 440, 18 C.M.R. 64 (1955)—General Teagarden was not off on a "frolic of his own" in negotiating the conditions for immunity with petitioner's counsel but was performing a mission assigned to him by his commander. Moreover, whether the analysis be in terms of due process or of failure to comply with a promise of immunity, I join Judge Fletcher in concluding that the Government cannot improve its legal position because its left hand did not know what its right hand was doing. *Cf. Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971).[5]

I am convinced that under paragraph 68*h* of the Manual, a promise or grant of immunity made by a subordinate on behalf of an officer exercising general court-martial jurisdiction may later be ratified by that official. Restatement (Second) of Agency §§ 82, 83, 84(1), 95, 98, and 99 (1957).[6] Thus, if a subordinate acting for that commander—especially if it is his staff judge advocate—offers immunity and at a later time the commander ratifies the offer, then, once the accused meets its conditions, he cannot be prosecuted. Relying on the premise that silence unaccompanied by affirmative action is insufficient to constitute ratification, the military judge found that General Ellis never ratified the promise of immunity made by his "legal spokesman," General Teagarden, to Cooke's counsel. However, the unusual circumstances here— recounted by the lead opinion as part of its due process analysis—created an obligation for the commander to speak; and silence in the face of that obligation should be considered ratification. *Cf. Weber v. Towner County*, 565 F.2d 1001, 1008 (8th Cir. 1977); *Gilmore v. Constitution Life Insurance Company*, 502 F.2d 1344, 1348 (10th Cir. 1974); *Advance Mortgage Corporation v. Guaranty Title Insurance Company*, 416 F.2d 451, 454 (5th Cir. 1969); *Greif Brothers Cooperage Corporation v. United States Gypsum Company*, 341 F.2d 167, 175 (8th

5. In light of *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), General Ellis must be viewed for legal purposes as if he had been personally aware of the information conveyed by various messages to the Headquarters of the Strategic Air Command, even though his staff may not have brought them to his personal attention. At some point, a commander must be charged with notice of facts whereof reasonable persons would anticipate that he should have known, regardless of the actual circumstances. Certainly imposing on a commander some responsibility for the acts or omissions of his subordinates is not a concept alien to military law or the law of war. *In re Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946).

6. "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." (§ 82).

"Affirmance is either (a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or (b) conduct by him justifiable only if there were such an election." (§ 83). Section 17—which concerns delegation to an agent—obviously is irrelevant to ratification, since for ratification to occur the *principal* must himself approve of the action purportedly undertaken by the agent in his name.

Cir. 1965); *Updegrave v. Reliance National Investors Corporation*, 337 F.2d 604 (9th Cir. 1964); Restatement, *supra*, § 94.[7] Moreover, a message which General Ellis sent on May 26, 1981, to the Chief of Staff of the Air Force clearly met any legal requirement that ratification be shown by more than the silence of the principal.[8] This message states in paragraph 4:

> Lt Cooke was not completely forthcoming in his statement of 17 May 1981. This is indicated by reactions to questions 16, 17, and 18 during the 21 May 1981 polygraph and his subsequent revelations following that polygraph which were not a part of his 17 May 1981 statement. He thereby abrogated any agreement which may have existed: Such agreement being absolutely and unequivocably conditioned on his being fully forthcoming during this opportunity to give a complete statement prior to, and I repeat, prior to the polygraph. The purpose of the polygraph was to establish Cooke's truthfulness and completeness, rather than as a cathartic, insofar as any agreement to which SAC

might have been a party or may have authorized.

After General Ellis sent this message on May 26—which referred to "abrogat[ing] any agreement which may have existed" and which explained why a polygraph test was required as part of "any agreement to which SAC might have been a party or may have authorized"—I am convinced that, for purposes of paragraph 68*h*, he had ratified the promise of immunity given by his staff judge advocate.[9] Thus, no leeway remained for General Teagarden to suggest two weeks later that General Ellis had never authorized such a promise. Likewise, the message's reference to a "statement of 17 May" demolishes the contention that any promise of immunity communicated by General Teagarden referred only to a prior statement made by petitioner on *May 7*.

## II

If a due process analysis is used, the same result of dismissal is required. Judge Fletcher has demonstrated this in his analysis, with which I fully concur. Moreover, several appellate courts—in cases involving

---

7. One circumstance tending to establish ratification is the principal's receipt of benefits as a result of the agent's action. In oral argument Air Force counsel denied that any benefits were received as a result of Cooke's disclosures. The classified information is at odds with this position and makes it obvious that some of petitioner's revelations were of benefit to the Air Force in reassuring itself of its combat readiness. Furthermore, common sense would suggest that CINCSAC would wish—or *should* wish—to know if Cooke were a "lone wolf" or were acting in collaboration with others. Finally, it should be of some importance to the Strategic Air Command to learn how a potential traitor or spy can be placed in such a sensitive position and what precautions should be utilized henceforth to forestall a repetition of this occurrence.

8. In a commendable effort to meet its obligations of full disclosure, the Air Force volunteered a copy of this message for consideration by our Court in ruling on Cooke's previous petition for extraordinary relief. Of course, the message does not bear the personal signature of General Ellis and he may not have personally considered its implications; but when a written message is transmitted from the headquarters of one commander to another, the former cannot disavow its contents.

9. The military judge found that, "[b]y approving ... [this] paragraph ..., General Ellis did not intend to adopt or ratify any agreement with the accused." Finding 35. However, subjective intent is not always determinative; and for many purposes persons—even military commanders—are bound by their words, regardless of their state of mind. Thus, I conclude that, as a matter of law, the promise of immunity was ratified by an officer exercising general court-martial jurisdiction. Furthermore, undisputed testimony reveals that the Judge Advocate General and Deputy Judge Advocate General of the Air Force, the Director of the Air Force Judiciary, the Chief of Staff of the Air Force, and—at one point—even the General Counsel of the Department of Defense, were kept informed of the developments in the investigation of petitioner. In view of the awareness at such high levels that Cooke was being promised immunity from military prosecution if he made full disclosure, the argument for ratification is strengthened—whether or not any of these officials was "[a]n authority competent to order a person's trial by general court-martial." *See* para. 68*h*, Manual for Courts-Martial, United States, 1969 (Revised edition).

serious crimes—have refused on due process grounds to allow a prosecution to continue in violation of a pretrial agreement concerning results of a polygraph examination.

Thus, in *People v. Reagan*, 395 Mich. 306, 235 N.W.2d 581 (1975), the Michigan Supreme Court held that the prosecuting attorney was bound by an agreement to dismiss the prosecution if the defendant passed a polygraph examination. In that case, pursuant to the agreement, a *nolle prosequi* had been taken by leave of court after the defendant passed the polygraph examination given by a member of the Michigan State Police. In approving dismissal of the charges, the trial court was aware that the defendant had passed the polygraph test but did not know about the agreement between the defense and the prosecution. Subsequently, the prosecutor's office entertained serious misgivings about the test results because of information "that, with respect to crimes such as defendant allegedly committed, a schizophrenic nature will sometimes distort polygraph test results," *id.* 235 N.W.2d at 583, so "a new complaint" was filed "on the same charges" that had been nolle prossed. Defendant's motion "to quash the information on the basis of the ... 'agreement'" was denied, since the trial court did not perceive "that defendant had been in any way 'prejudiced' by withdrawal of the agreement." *Id.* 235 N.W.2d at 584 (footnotes omitted). Thereafter, defendant was convicted by a jury of torturing a child and assault with intent to do great bodily harm.

After noting "that polygraph use by prosecutors' offices, principally prior to the issuance of a complaint, is not uncommon, and indeed is a useful investigatory device," *id.* 235 N.W.2d at 584–85 (footnote omitted), the Michigan Supreme Court observed that the "[d]efendant had much to gain and relatively little to lose by subjecting himself to the polygraph." Nonetheless, the Court rejected the prosecution's argument that the bargain lacked the consideration necessary to make it binding, for

> [w]hile there is precedential reference to the concept of "consideration" for a bargain in the context of the administration of criminal justice, we feel that here the analogy to contract law is inappropriate. The standards of commerce do not govern, and should not govern, the administration of criminal justice.

*Id.* 235 N.W.2d at 585 (footnote omitted). The Court remarked that there was "record testimony indicating that the agreement with defendant was entered into with the knowledgeable concurrence of key members of the prosecutor's staff," and the situation was not one "where the prosecutor is misled by force of defendant's connivance into a disadvantageous agreement or where facts not within the fair contemplation of agreement have come to light." Accordingly, it reversed the conviction and discharged the defendant because

> [l]aw enforcement processes are committed to civilized courses of action. When mistakes of significant proportion are made, it is better that the consequences be suffered than that civilized standards be sacrificed.

*Id.* 235 N.W.2d at 587.

In *State v. Davis*, 188 So.2d 24 (Fla.App. 1966), *cert. denied*, 194 So.2d 621 (Fla.1966), which was relied on in *Reagan*, defendant had been indicted for first-degree murder and had pleaded not guilty. Shortly before trial, the defendant and the prosecution agreed that a polygraph test would be administered by an appointed examiner and if the test showed deception, defendant would plead guilty to the lesser charge of manslaughter, but if the polygraph showed that defendant was telling the truth, the charges would be dismissed. After the test had been given, the appointed examiner indicated that defendant was telling the truth. A second polygraph examiner reached a different conclusion.[10] Even so, the Florida Court of Appeals found the agreement enforcible for

telling the truth.

---

10. In the case at bar, all the polygraph examiners—three, in fact—concluded petitioner was

[d]efendant had agreed to plead guilty to manslaughter if the test was not in his favor, but the state had agreed to dismiss the case if the results indicated defendant was telling the truth. This was a pledge of public faith—a promise made by state officials—and one that should not be lightly disregarded.

*Id.* at 27.[11]

In *Butler v. State*, 228 So.2d 421 (Fla. App.1969), also cited in *Reagan*, defendant had agreed with the prosecutor that the prosecution for rape would be terminated if the polygraph indicated that defendant was telling the truth, but that if the test showed otherwise, the results could be used at trial or upon appeal. After the polygraph examiner concluded that defendant was truthful in denying participation in the alleged rapes, an order of nolle prosse was entered. Later the state commenced prosecution again; defendant was indicted and convicted. However, the appellate court reversed and, in quashing the indictment, commented:

> Criminal prosecutions are, of course, a deadly serious undertaking. They are not a game and sportsmanship is perhaps not a factor. Even so, we feel that our historical ideals of fair play and the very majesty of our government command that an advantage as here reflected not be sanctioned.

*Id.* at 424–25.

In *Workman v. Commonwealth*, 580 S.W.2d 206 (Ky.1979), the defendant moved to dismiss the murder indictment—on which he had been convicted and sentenced to life imprisonment—because of a pretrial understanding that, if a polygraph examination indicated that he had no involvement in the homicide, the charge would be dismissed. In reversing the conviction and dismissing the indictment, the Kentucky Supreme Court observed (*id.* at 207):

> It is plain that the Commonwealth, acting through its agents who had apparent if not actual authority, entered into an

agreement with Workman to abandon their prosecution of him if he passed a polygraph examination given by the Kentucky State Police. It is equally apparent that even though he took and passed such examination on March 28, 1977, the Commonwealth took no steps to fulfill its bargain as late as November 21, 1977, when Workman asked the circuit court to enforce the bargain.

The question is not whether the Commonwealth's bargain was wise or foolish. The question is whether the Commonwealth should be permitted to break its word.

The standards of the market place do not and should not govern the relationship between the government and a citizen. *People v. Reagan*, 395 Mich. 306, 235 N.W.2d 581, 585 (1975). "Our government is the potent, the omnipresent, teacher. For good or ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944, 960 (1928) (Brandeis, J., dissenting). If the government breaks its word, it breeds contempt for integrity and good faith. It destroys the confidence of citizens in the operation of their government and invites them to disregard their obligations. That way lies anarchy. We deal here with a "pledge of public faith—a promise made by state officials—and one that should not be lightly disregarded." *State v. Davis*, Fla.App., 188 So.2d 24, 27 (1966).

\* \* \* \* \* \*

"[N]o distinction can be taken between the government as prosecutor and the government as judge." *Olmstead v. United States, supra* [277 U.S.] at 470, 48 S.Ct. at 575 (Holmes, J., dissenting). When as here, our historical ideals of fair play and substantial justice do not permit attorneys for the Commonwealth to disregard promises and fail to perform bargains, it does not permit the judge to allow such iniquities to succeed. *Butler*

11. *See also Chambers v. State*, 146 Ga.App. 126, 245 S.E.2d 467, 469 (1978), which states: "We hold that agreements between counsel regarding conditions for taking a polygraph examination must be scrupulously adhered to by both sides."

v. State, Fla.App., 228 So.2d 421, 424–25, 36 A.L.R.3d 1274, 1279 (1969).

### III

In my earlier dissent in this case, I emphasized that, where, as here, the stakes are high, a suspect who has been asked for information—and his lawyer—must know that a promise of immunity which is given by a staff judge advocate possessing all the indicia of apparent authority and is reasonably relied on by the suspect will thereafter be judicially enforced. Otherwise, lips will remain sealed when it is vital to national security that they be unlocked.[12] Although in this case an officer who may well have been a spy and traitor will escape military prosecution,[13] it still is in the national interest that the promise of immunity be enforced. Likewise, it is in the national interest that the imperatives of due process, on which the principal opinion relies, be fully obeyed.

Accordingly, I join Judge Fletcher in granting the petition.[14]

COOK, Judge (dissenting):

Shorn of its rhetoric this case is simple to resolve. The military judge, after an extended evidentiary hearing, made findings of fact and a conclusion of law. These findings of fact, if supported by the evidence of record, are binding on this Court.

United States v. Middleton, 10 M.J. 123 (C.M.A.1981); United States v. Vasquez, 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973); United States v. Alaniz, 9 U.S.C.M.A. 533, 26 C.M.R. 313 (1958). I have read the entire record, and I agree with the findings of Judge Orser.

In order to set in context the findings of fact, some delineation of the states of mind of the officers in the case is necessary. It is clear to me that there was a misunderstanding of purpose at the very beginning of the investigation and that misunderstanding permeated the thinking of the officers to the extent that it became wide as a gulf. Why this happened, I need not speculate. Suffice it to say that the revelation of intentions of the officers was diluted and distorted in passing through the minds of the intermediaries to the extent that eventually there was a complete breakdown of communications.

On April 27, 1981, Major General Pringle, Chief of Staff, Strategic Air Command (SAC), was notified by the District Director of the Air Force Office of Special Investigations (OSI), that a Titan Missile Crew Deputy Commander (Lieutenant Cooke) had made visits to the Embassy of the Union of Soviet Socialist Republics, and that it appeared that the visits were associated with studies in political science in which the officer had majored while in college. General

---

**12.** A grant of testimonial immunity may provide a basis for prosecuting someone who refuses to testify in a court or administrative proceeding. Cf. 18 U.S.C. § 6001–05. However, it sometimes will not be as effective as a grant of transactional immunity in persuading a suspect to reveal incriminating information.

**13.** Like Judge Fletcher, I shall not discuss here whether the actions of the convening authority and his staff judge advocate had an effect only on the Air Force's right to try petitioner by court-martial or whether he still might be tried in a federal district court for his alleged violation of 18 U.S.C. § 793(d). On this issue the argument for the Government is strengthened by the circumstance that some of the discussions with petitioner and his counsel apparently were not in terms of transactional immunity from prosecution but instead centered on prompt administrative separation from the Air Force—which in itself would only preclude mil-

itary prosecution, but would not affect otherwise existing federal criminal jurisdiction. But cf. United States v. Kirsch, 15 U.S.C.M.A. 84, 95, 35 C.M.R. 56, 67 (1964).

**14.** Since we grant the petition for extraordinary relief on other grounds, there is no occasion to consider such issues as these: (a) Since the Director of the Air Force Judiciary and the Chief of the Air Force Trial Judiciary were involved in the investigation and preparation of the case for prosecution, did this render all Air Force military judges subject to challenge in this case? (b) Since a substantial amount of the government's evidence would be tainted— even under the analysis by Judge Cook and by the trial judge—would this taint affect the Article 32 investigation in any way, and, if so, would delay for further pretrial investigation, while Cooke remained in confinement, lead to speedy trial problems?

Pringle notified the Commander-in-Chief, General Ellis, and the Vice Commander-in-Chief, Lieutenant General Leavitt. Subsequently, on April 30, General Pringle was informed that Lieutenant Cooke was scheduled to go on leave on May 2 and that the OSI wanted the leave cancelled. Because of the difficulty in rescheduling leave for the entire missile crew, General Pringle did not agree to cancel the leave. Instead, he told the OSI "to keep ... [Lieutenant Cooke] under close surveillance"[1] and if he attempted to go to the Soviet Embassy, he was to be apprehended.

On the morning of May 5, the OSI director informed General Pringle that the OSI had lost Lieutenant Cooke and that he had gone to the Soviet Embassy on May 2. General Pringle immediately informed General Ellis, who directed that Lieutenant Cooke be picked up, read his rights, and interrogated.[2] General Ellis told General Pringle to contact the SAC Staff Judge Advocate, Brigadier General Teagarden. At that point in time, General Ellis believed that "we either had an oddball with a possibility of a serious espionage case" since, in his experience, it was unusual for a spy to go to the front door of the Soviet Embassy. He also knew that he would have to take action to negate any possible damage which might have been done. However, he wished to find out, if possible, exactly what happened before beginning the negation process which was "very tedious, time consuming, and difficult to do." General Ellis called the Deputy Chief of Staff, Intelligence, and asked for a list of those classified items to which a missile deputy commander would have access. He also called the Chairman of the Joint Chiefs of Staff and the Chief of Staff, Air Force, to inform them of what had happened and what SAC intended to do.

On May 9, General Ellis was briefed by Generals Leavitt, Pringle, and Teagarden on the statement made by Lieutenant Cooke on May 7 which sounded like a "fantasy."[3] He was told that Lieutenant Cooke

---

1. *General Ellis*

Yes, General Pringle indicated that the Lieutenant was going on leave and I asked what arrangements had been made and he said that the OSI was going to keep him under close surveillance. And I said, "Fine." And that was the end of that conversation.

2. *General Ellis*

Yes, General Pringle came in my office and said that the Lieutenant had in fact visited the Soviet Embassy, that the OSI had him at the airport. However, they had verified later that he had visited the embassy. I asked him what the intentions of the OSI were and he said they were going to let him finish his leave, return to McConnell, and undertake the investigation at that point. I said, "No, we're going to pick him up right now."

*General Pringle*

General Ellis directed me to do a couple of things; one, to get General Teagarden and come into the office and pick Cooke up immediately, or to put into action those things that had to be done to have him picked up.

Yes, we did. It was very apparent now that we knew that our Second Lieutenant had in fact been talking to the Russians. We wanted to find out what his relationship was immediately with the Russians and what it was he was doing there and what it was he was talking about or doing. We wanted him picked up immediately. We wanted his

rights read to him. We wanted to have the OSI get a statement from the cab driver of the cab that he did in fact take Lieutenant Cooke to the Embassy, and then we wanted a statement from the guard at the gate of the embassy that Cooke had passed, passed through the embassy gates.

*General Ellis*

Q. Did anyone explain to you that the problem was, reading Cooke his rights might well shut off the opportunity to do the damage limiting investigation that you yourself had asked for?

A. I didn't look at it that way. If anyone else did, there's the possibility I guess. I always looked at it that we could negate anything he had done at any time and it was desirable, however, to find out the extent of damage, if any, before negating it.

. . . . .

In my own mind, obviously, the first thing was to find out what had to be done to negate the damage, if there had been any damage.

. . . . .

And the second thing was to insure that punishment was passed out to the offender.

3. *General Pringle*

Yes, he came to me and said that Cooke had made a statement on 7 May and conveyed to me the sense and the essence of the statement. It was conveyed that we had a very

would not take a polygraph on the statement without assurances of some kind from SAC. It was recommended to General Ellis "that if . . . the statement was validated by a polygraph examination," it could be concluded "that we indeed had an oddball here, and . . . he should be separated from the Air Force either by resignation or action" by the command.[4] He agreed with the proposal, recognizing that if nothing was forthcoming from Lieutenant Cooke, he still had the option to negate, and time was running

> naive young Second Lieutenant who was deeply involved in an issue of political science in relationship between the USSR and the US, and that it appeared that his motives were ones to specifically bring a better relationship between Russia and the US. I thought to myself, "My God, all the men in Russia and all the men in this country haven't been able to do it and here we've got a Second Lieutenant who can do that." It seemed highly honorable but kind of naive and we needed to know more about him. But I think that my impression was that it confirmed the things that we had heard previously from the OSI that they knew about him, that it looked as though we had a pretty naive young man that was doing some things that were not very realistic.
>
> *General Ellis*
> And they described to me these conditions and they recommended that if, in fact, the statement was validated by a polygraph examination that we indeed had an oddball here and that he should be separated from the Air Force either by resignation or action on our part.
>
> *General Leavitt*
> Teagarden was pleased because apparently Lieutenant Cooke had made a confession that was now written down and available to us, and the indications from the confession were that we had a nut on our hands, if you'll pardon the use of the vernacular, and that the serious concerns that SAC had about the compromise of classified material could be put aside on the basis of this confession. That Cooke had visited the Soviet Embassy as a foreign relations student in a broad sense, and that he was interested in acting as a conduit, I think, were the words that were used to discuss frictional areas that existed between the Soviet Union and the United States. Naturally, we would be very much relieved if that had been the case.
>
> 4. *General Leavitt*
> So I told Teagarden, I said, "Well that's good news if that's the case, but I am skeptical about it and what are our precautions against this?" And Teagarden told me that they had an agreement, they being SAC and ___ the principal had worked out an agreement that covered several points. And the points as I recall them were, first of all, to make sure Cooke's confession was accurate he would be given a polygraph; that all points that were covered in the confession would have to be absolutely accurate; and that the whole of

> his confession would have to be accurate. In other words, there would not be omissions. The third point was that if any part of this was not accurate, we would go ahead and prosecute.
> On the other hand, if it was an accurate confession, as proven by the polygraph, then we would grant Cooke an honorable discharge, and not prosecute him for his relatively innocuous crime of going to the ___ relatively, in the sense of comparing it to espionage ___ innocuous crime of going to the Soviet Embassy and not reporting it several times.

Special Agent Hoffman recorded this agreement as follows:

> *SAC POSITION*
> 1. If the polygraph is not taken
> a. Worse Case—Continue with AFOSI investigation and upon completion HQ SAC will evaluate appropriate Command action, based on investigative results, IAW the UCMJ for failure to obey AFR 205–57 and any other offenses uncovered.
> b. Best Case—Investigation continues and HQ SAC will initiate Administrative separation action under AFR 36–3.
> 2. If the polygraph is taken and deception is indicated.
> Same as 1a and 1b, above.
> 3. If the polygraph is taken and no deception is indicated
> a. HQ SAC will allow Subject to resign under AFR 36–12 section B, Para 2–8, 2–13, table 2–6, rule 29 (misc reasons).
> b. Subject's tender of resignation will be favorably received.
> c. Subject will be allowed to continue leave in the Richmond area until requested to return to McConnell AFB for final outprocessing.
> 4. Considerations
> a. AFR 36–3. Subject will receive an honorable discharge but action will be initiated by the USAF (fired).
> b. AFR 36–12. Subject's resignation will be honorable however Subject initiates and it is basically a mutual separation without the connotation of Subject being fired.
> c. Successful resolution clears any doubts that might exist regarding exact nature and extent of Subject's relationship with Soviets and allows Subject the opportunity for future employment with another government agency.

out for that action.[5] If Lieutenant Cooke refused to take the polygraph, he was to be returned to his home base (McConnell Air Force Base, Kansas), and charges brought against him.[6]

Later that evening, General Teagarden contacted General Ellis with the information that Lieutenant Cooke had agreed to take the polygraph and that transportation to McConnell Air Force Base had been cancelled.

On the morning of May 10, while on board an aircraft ready to depart for the Western Pacific area, General Ellis was told by Generals Pringle and Teagarden that Lieutenant Cooke had confessed to actually passing sensitive papers to the Soviets and that the investigation was continuing.[7] He released a message to the Joint Chiefs of Staff which initiated the negation process. While on the aircraft bound for Hawaii, General Ellis personally composed a message informing the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Chief of Staff of the Air Force of certain things which he believed needed to be done. He showed the message to Generals Pringle and Teagarden, who were on board. Knowing that Lieutenant Cooke had not been advised of his rights, he knew that the confession could not be used against him, but he wished the investigation continued to establish "as . . . prosecutable a case as possible." [8]

5. *General Ellis*

I don't remember exactly who he had it with. As I recall it was a proposal and I agreed with it, recognizing that if we didn't get anything from him we still had the option to negate. And I must say by this time I was beginning to feel a little pressure in terms of urgency in taking some action.

6. *General Ellis*

Was going to return him to ___ and they briefed me on that too ___ to return him to McConnell and continue the investigation or charge him.

*General Pringle*

[W]e had agreed that we, one, would want the Lieutenant to take a polygraph test and the purpose of the test was to insure that the 7 May statement was fully revealing about his association with the Russian Embassy, and that it was truthful; and that if it was in fact fully revealing and truthful, the 7 May statement, that we would honor any request from Lieutenant Cooke for an honorable separation from the Air Force. And if at any time he refused to take the polygraph test, I was going to arrange for an airplane to bring him back immediately and told him that that had already happened, that just prior to my coming into his office I had heard from the OSI that Cooke had in fact refused to take the polygraph test. I told him that if there were any changes to that I would be sure to keep him informed.

7. *General Pringle*

I guess if that's what you call it. I call it a yellow scratch pad. But there was about a page and a half of statements recorded by the OSI over a secure phone that Cooke had testified to giving to the Russians. And I have to tell you that I was really in a state of shock. I read that piece of paper a couple of times and I simply ___ It was difficult for me to believe what I was reading. Now, you have to remember that up until about one o'clock that afternoon of that day, everything that we had heard about our Lieutenant was that he was a naive political science student and he was pursuing those endeavors and that was his reason for seeing the Russians. And I've got a piece of paper in my hand, the likes of which I've never seen in my thirty-one years in the Air Force and never hope to see again. And I was reading something that told me we had a traitor on our hands and that really shocked me.

*General Ellis*

We were getting ready to depart on a trip and when I boarded the aircraft, Generals Pringles [sic] and Teagarden told me that the accused had confessed to actually passing sensitive papers to the Soviets, that the investigation was continuing, that we had sent specialists from the different functional areas within the SAC staff to assist the OSI in carrying out the investigation, that ___ I think they also told me that two or three people from the Joint Staff had been sent down to assist them and there was a message that had been drafted up to the Joint Staff which initiated the negation process that I mentioned earlier and it described the actions we were taking and what we intended to do. I think we made a couple of corrections to it and I approved the message and it was sent out by, I believe, General Autry.

8. The message, in pertinent part, reads as follows:

FOR GENS JONES AND ALLEN INFO SECY WEINBERGER AND GEN LEAVITT FROM ELLIS
. . . HOWEVER, THERE IS NO FEASIBLE ALTERNATIVE TO FULL DISCLOSURE, AT THIS POINT OUR OBJECTIVES SHOULD BE TO MAKE THE EPISODE AS UNCOM-

Upon returning from the trip on May 15, General Ellis was briefed by General Leavitt, but he did not recall any mention of "immunity."[9] General Ellis, having had considerable experience as a general court-martial convening authority, knew that im-munity was a formal process requiring his specific approval and was always presented to him in writing.[10]

It was not until May 19 or 20 that General Ellis became aware that there was a problem with the agreement.[11] He called that Lieutenant Cooke made." But I said, "I've had the staff," and I'm speaking now of the JAG staff, "working on other ways that he violated the law to see if we could press on these other points." And that was a follow-on from the meeting that I had with Ratcliff. He said ___ General Ellis is a very calm and deliberate individual and I didn't detect from him any great concern in expression that this was a surprise to him or anything like that. He simply advised me, asked me if I had ___ he told me to advise Teagarden of these, General Teagarden of these points. And I did shortly thereafter.

FORTABLE AND AS UNPLEASANT FOR THE SOVIETS AS POSSIBLE AND TO ESTABLISH THE STRONGEST POSSIBLE DETERRENT TO FUTURE BREACHES OF SECURITY THROUGH SWIFT AND UNRELENTING PROSECUTION OF THIS CASE TO THE FULL EXTENT OF THE LAW. COOKE IS A TRAITOR OF FIRST MAGNITUDE AND TREASON IS THE CRIME.

. . . . .

I AM ADVISED BY THE SAC JA THAT SINCE COOKE WAS NOT ADVISED OF HIS RIGHTS, WE HAVE NO CONFESSION WE CAN LEGALLY USE ON WHICH TO CHARGE ESPIONAGE, FROM THIS POINT ON, .... FUTURE INTERROGATIONS OF COOKE SHOULD CENTER ON ESTABLISHING AS STRONG AND PROSECUTABLE A CASE AS POSSIBLE. IN THIS REGARD EXHAUSTION OF ALL INVESTIGATIVE AVENUES SHOULD BE ACCOMPLISHED PRIOR TO PLACING COOKE ON THE POLYGRAPH.
I RECOMMEND WE MOVE QUICKLY TO ORGANIZE THE APPROPRIATE PUBLIC RELEASES BEFORE A LEAK OCCURS. REGARDS.

9. *General Leavitt*
Well, as you mentioned, it was my custom to always meet the CINC when he returned from a trip. In the priority of things, this was not our highest priority item. I realize this may seem incongruous in this setting, but it really was not at the time. When he first got off the airplane, I asked him how the trip went and we exchanged a couple pleasantries on that. The second item, and of prominent concern in my mind, was the business about how our new bomber program was coming. We were in the midst, at that time, of arguments with both the present administration and the Air Staff about what should be the new bomber, and we were very intensely interested in that and there was a lot of Congressional interest in it and so on. So that was the major thrust of my conversation with him, was a quick resume of what we'd been talking about that week on the new bomber.
Then I said, "There's been a" ___ or words to this effect and I don't recall my exact words. I said, "There's been an unfortunate turn of circumstances in the Cooke case." I said, "The OSI in the interrogation has apparently gone beyond what we had visualized and we may not be able to use the confession that Lieutenant Cooke ___ the second confession

*General Ellis*
Q. And I assume he [General Leavitt] briefed you on several matters, possibly including the Cooke case?
A. Yes, I'm not too clear as to what he told me about the latter subject. Our attention was focused on the selection of a new bomber. We were vitally interested in that and most of the short discussion we had had to do with developments with regards to the bomber. He probably brought the case up, gave me a short status report, but I don't remember anything that was of significance.
Q. You don't remember him briefing you that there was a question as to immunity, is that correct?
A. No, that doesn't mean he didn't, but I don't remember. And it didn't raise any hackles at the time because there was no immunity and none intended at any time.

10. *General Ellis*
Well, it's a very formalized process. I can't remember a single time that I granted immunity, and it wasn't all that number of times as my statement may have sounded like, but there was a formal paper that was drawn up by the judge, staffed throughout the staff, and usually presented to me by the Judge Advocate or his Deputy. If it just came up as part of the paper mill, I can remember one or two instances when that happened, I would call him on the squawk box and make sure I had the authority. I knew that there were some restrictions on the authority to grant immunity, so I was very careful to insure that I had the authority when I signed that piece of paper.

11. *General Ellis*
Q. Did you know that General Leavitt and Colonel Ratcliff, while you and General Tea-

General Leaf, the Air Force Inspector General and overall commander of OSI, but could not get any clarification of the problem. He also called the Air Force Chief of Staff who said he would look into the problem. Receiving no further information, General Ellis assumed that there was no problem. When General Teagarden returned from Washington, D. C., on May 25, he brought with him certain requests from the General Counsel of the Department of Defense which had to be answered before Lieutenant Cooke was formally charged. General Ellis still did not understand that there was some problem with an agreement since no one in authority had contacted him and he was the only person who could grant immunity. He believed "that regardless of whose agreement it is, it's invalid." [12] In this regard, he relied on his May 10 message as accurately stating his position on the matter.[13]

In sum, General Ellis had from the beginning intended to prosecute Lieutenant Cooke whom he considered "a traitor of first magnitude," and he believed that any agreement which might have been made by OSI without his concurrence could not prevent him from taking that action.

How then could the OSI have misconstrued the agreement, intended by General Ellis as foregoing prosecution of the unreported visits to the Soviet Embassy if only for the purpose of furthering Lieutenant Cooke's interest in political science, as being a grant of immunity from prosecution for any admitted espionage going back 15 years? [14] The misunderstanding began on May 5 when, in discussing how the interrogation of Lieutenant Cooke was to be handled, Mr. Torpy, Acting Chief of OSI Counter Intelligence, told Colonel LeTarte, the Director of the United States Air Force Judiciary, that the best procedure to elicit the most complete information from Lieutenant Cooke was to interrogate him without advisement of his legal rights. However, in order to do that, the permission of the major command staff judge advocate was required. Colonel LeTarte was asked to intervene with General Teagarden to obtain that permission. Mr. Torpy understood that SAC wanted Lieutenant Cooke advised of his rights before questioning, but he knew that if Lieutenant Cooke asked for an attorney, OSI policy required interrogation to stop until an attorney was provided. Be-

---

garden were on the road, heard about some immunity and asked for a written report?

A. I have subsequently learned of that. I can't give you the exact time. He may have mentioned it to me, as a matter of fact, but it doesn't ring a bell. You've got to understand my mind set. My mind set was the 10 May message and the thought that anybody would expect CINCSAC to offer immunity across the board regardless of what had been done is incredible in my opinion.

12. *General Ellis*

I think as I testified earlier that Mister Taft or his superior, Secretary Weinberger, had never discussed this with me. He obviously had been briefed, presumably by General Bruton or his office, on General Bruton's understanding of the agreement. General Bruton never talked with me about whether or not SAC had offered immunity. He provided Mister Taft that information on the basis of one side of the questions only. Mister Taft, obviously, on the basis of that, thought there was an agreement of some kind. This was not the time, as far as I was concerned, to bring up the subject and introduce a new thought in here and I was just saying that

regardless of whose agreement it is, it's invalid.

13. *See* n. 11, *supra.*

14. On May 9, 1981, in a taped interview between Special Agent Hoffman and Lieutenant Cooke, Hoffman remarked:

That's a hell of an offer they're making. Because in their minds they don't know that you haven't given away everything that SAC owns, okay? You've said you haven't. In their mind, they don't really know it. They are willing to know it. They are still willing to let you take the Goddamn polygraph after that full disclosure, and if successfully passing it, at that stage still allow you option three. Now, if that doesn't typify and amplify their concerns about their weapons system and negate their concerns about nailing you to the wall, I don't know what the hell it means. Well, I mean that's[_ _]They're willing to accept you telling us that you've been spying for the Soviet Intelligence Service for the last fifteen years, as long as a full disclosure is made and you successfully resolve the issue with a polygraph. Just in case that didn't come through loud and clear.

lieving that this would foreclose further interrogation, Mr. Torpy preferred to interrogate without advisement in order to get full information, recognizing that any statement would not be admissible against Lieutenant Cooke. Colonel LeTarte called General Teagarden and discussed the matter. General Teagarden indicated that the primary purpose of the interrogation was damage assessment. Colonel LeTarte opined that if that were SAC's main goal, then General Teagarden should approve the OSI request. General Teagarden acceded to Colonel LeTarte's suggestion. Mr. Torpy then told Lieutenant Colonel Hoffman, the chief OSI interrogator, that SAC wanted damage-limiting information.[15] From that point on Colonel Hoffman worked on the assumption that information, not prosecution, was foremost in the mind of General Ellis and others at SAC.

When he was advised of Lieutenant Cooke's statement of May 7, Mr. Torpy felt that it "was plausible but bizarre." He therefore wanted it confirmed by a polygraph examination. On the basis of this information, General Pringle believed that Lieutenant Cooke was a terribly naive and immature person, but not a spy. He also was told that Lieutenant Cooke had refused to take a polygraph test. This brought about the meeting with General Ellis and Generals Teagarden and Leavitt, from which General Teagarden's statement of positions was given to Colonel Hoffman.[16]

It appears clear that the major parties to the matter, General Ellis and Colonel Hoffman, were subject to conflicting mind sets: General Ellis to obtain information with the dual aim of prosecuting a traitor and obtaining, if possible, damage assessment, and

Colonel Hoffman determined to find the extent of Cooke's disclosures even at the cost of having him go completely free. Once on these divergent tracks, the conduit of information, General Teagarden, neither adequately conveyed General Ellis' wishes nor understood the import of his own words. Indeed, "OSI and SAC were not singing from the same sheet of music."[17]

The question presented is: How can the person authorized to grant immunity be held to have acted when he consistently refused to so act and was unaware of the situation until long after the alleged immunity grant was made? Obviously, General Ellis cannot be bound by a breakdown in communications between his staff and the OSI without his knowledge and acquiescence. His only fault was in relying on his staff to carry out his instructions, which, he believed, were clear and unmistakable. The fact of his staff judge advocate's apparent inability to recognize the ramifications of his offer, even coupled with Lieutenant Cooke's reliance and detriment, cannot create something that was never there.

The power to grant immunity set forth in paragraph 68*h*, Manual for Courts-Martial, United States, 1969 (Revised edition), is based upon the decision of this Court in *United States v. Kirsch*, 15 U.S.C.M.A. 84, 35 C.M.R. 56 (1964). There, we found the power to grant immunity to be derived from the power of a convening authority to discontinue investigations of crimes, dismiss formal charges, direct a charge be withdrawn, and set aside findings of guilty, which are plenary in nature. Clearly such powers can only be exercised specifically: no one could assert that someone had *apparent* authority to convene a court-martial,

---

15. *Special Agent Hoffman*

Well, I received a wide range of instructions. It wasn't difficult to get any guidance at that time. And we were basically to interview Lieutenant Cooke, as I have previously testified to, without advisement of rights and to determine damage. That was the basic guidance and the basic course of action that we were pursuing at that time.

. . . . .

Q. When you received this advice, according to one of our interviews, Colonel Hoffman,

you informed Mister Torpy that in your opinion the result would be tantamount to granting the accused immunity, is that correct?
A. Yes, Sir, I didn't agree with the process.

16. *See* n. 4, *supra.*

17. *General Leavitt*

My concern was confirmed by that message that clearly the OSI and SAC were not singing from the same sheet of music.

or dismiss charges. Only actual authority can be exercised in these related instances.[18] From this, I conclude that the power to grant immunity from prosecution can only be exercised by a person authorized to convene general courts-martial and he must knowingly so act. It is not enough that an accused may have reasonably believed that he had been granted immunity; there must be actual immunity granted, or there is no immunity. *See United States v. D'Apice*, 664 F.2d 75, 30 CrL 2248 (5th Cir., 1981).

The lead opinion seems to combine the offices of convening authority and staff judge advocate at least to the extent of attributing knowledge and actions of one to the other. The identities and functions of the convening authority and the staff judge advocate are, however, different. The powers of the convening authority are found in Articles 22–30, 32–34, 49, 59–65, 71, 72, and 74(a), Uniform Code of Military Justice, 10 U.S.C. §§ 822–30, 832–34, 849, 859–65, 871, 872, and 874(a), respectively. At no place do I discover any indication that the convening authority may share his responsibilities with his staff judge advocate. At most he must obtain from his staff judge advocate certain legal advice before he exercises his discretionary power. Article 34(a), UCMJ, 10 U.S.C. § 834(a).

The convening authority exercises investigative [*United States v. Conn*, 6 M.J. 351 (C.M.A.1979)], judicial [*United States v.*

---

**18.** Unlike the Chief Judge, I do not believe the civil law principles of contracts and agency apply in this setting. However, I feel compelled to point out that it is well-settled that the doctrine of apparent authority—or equitable estoppel—is not applicable to one dealing with the United States Government:

> The case no doubt presents phases of hardship.... Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority must be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. See, e.g., *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791; *United States v. Stewart*, 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40, and see, generally, *In re Floyd Acceptances* [74 U.S. 666], 7 Walls. 666, 19 L.Ed. 169.

*Federal Crop Ins. Corporation v. Merrill*, 332 U.S. 380, 383–84, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947).

> Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit. *Lee v. Munroe*, 11 U.S. (7 Cranch, 366), 3 L.Ed. 373; *Filor v. United States*, 76 U.S. (9 Wall. 45, 49), 19 L.Ed. 549; *Hart v. United States*, 95 U.S. 316, 24 L.Ed. 479; *Pine River Logging Co. v. United States*, 186 U.S. 279, 291, 22 S.Ct. 920, 925, 46 L.Ed. 1164.
>
> As presenting another ground of estoppel it is said that the agents in the forestry service and other officers and employees of the Government, with knowledge of what the defendants were doing, not only did not object thereto but impliedly acquiesced therein until after the works were completed and put in operation. This ground also must fail. As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest. *United States v. Kirkpatrick*, [22 U.S.] 9 Wheat. 720, 735 [6 L.Ed. 199]; *Steele v. United States*, 113 U.S. 128, 134 [5 S.Ct. 396, 398, 28 L.Ed. 952]; *United States v. Beebe*, 127 U.S. 338, 344 [8 S.Ct. 1083, 1086, 32 L.Ed. 121]; *United States v. Insley*, 130 U.S. 263, 265–266 [9 S.Ct. 485, 489–450, 32 L.Ed. 968]; *United States v. Dalles Military Road Co.*, 140 U.S. 599, 632 [11 S.Ct. 988, 998, 35 L.Ed. 560]; *United States v. Michigan*, 190 U.S. 379, 405 [23 S.Ct. 742, 751, 47 L.Ed. 1103]; *State ex rel. Lott v. Brewer*, 64 Alabama, 287, 298; *State v. Brown*, 67 Illinois, 435, 438; *Den v. Lunsford*, 20 N.Car. 407; *Humphrey v. Queen*, 2 Can.Exch. 386, 390; *Queen v. Black*, 6 Can. Exch. 236, 253.

*Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–09, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917).

*Accord: Jacob Reed's Sons, Inc. v. United States*, 273 U.S. 200, 47 S.Ct. 339, 71 L.Ed. 608 (1927); *Chase v. United States*, 155 U.S. 489, 15 S.Ct. 174, 39 L.Ed. 234 (1894); *Whiteside v. United States*, 93 U.S. 247, 257, 23 L.Ed. 882 (1876); *The Floyd Acceptances*, 74 U.S. (7 Wall.) 666, 680, 19 L.Ed. 169 (1869); *United States v. Bentley & Sons, Co.*, 293 F. 229, 234 (S.D.Ohio 1923).

Thus, in contracts as well as here, a government agent can only bind the Government by the exercise of *actual authority*.

*Crossley*, 10 M.J. 376, 379 (C.M.A.1981) (Everett, C. J., concurring), *United States v. Ellsey*, 16 U.S.C.M.A. 455, 37 C.M.R. 75 (1966)], and prosecutorial [*United States v. Hardin*, 7 M.J. 399 (C.M.A.1979)] powers— all as part of his overall role as the person responsible for the disciplinary status of his command. We have recognized that he must often view the same case while "wearing different hats" and have held that, as long as he does not commingle his separate functions in the exercise of his powers, the fact that they may involve, in a given situation, differing decisions at various stages of the court-martial process, creates no judicial impediment to his actions. Likewise, the staff judge advocate has certain statutory functions, some of which involve his decision-making role, and others which cast him merely as an advisor to the convening authority. Obviously, if the two roles are combined, the basic concept of the Uniform Code is defeated. This certainly was not intended by Congress, which sought to create a system which balanced the commander's need to maintain discipline with a regard for the rights of the accused.

The Chief Judge, in his concurring opinion, has decided that the convening authority delegated his authority to his staff judge advocate to negotiate a binding immunity agreement. As I have shown before, the power to grant immunity does not appear in the Uniform Code of Military Justice but is derived from paragraph 68*h*, Manual, *supra*, which, in turn, was derived from the language in *United States v. Kirsch, supra*. There, as stated previously, the power to grant immunity was found to be inherent in the power of the convening authority to take certain actions involving courts-martial. Thus, my first disagreement with his opinion stems from his conclusion that a

power exists to delegate an authority which is based solely on authority inherent in other powers specifically granted to the convening authority by the Code. True it is that "the Manual contains no explicit prohibition against a convening authority's delegation to his staff judge advocate of the power to negotiate a binding immunity grant," 12 M.J. 335, 353, but I have serious reservations as to whether, if such power were given in the Manual, it would be sustainable in the absence of some specific statutory recognition.[19] The reason for my conclusion is that the concept of delegation of the authority to grant immunity would contradict the other powers of the convening authority given expressly by the Code to the convening authority and which are not delegable.[20]

Thus, I find it inconsistent to hold that the convening authority cannot delegate the power to refer cases to trial, convene courts, appoint members of a court-martial, detail a military judge or counsel, review the action of the court-martial, suspend the sentence adjudged or vacate the suspension of a sentence, but that he can delegate the even more substantial power to grant immunity from prosecution.

Of course, if the Chief Judge means "negotiate" in the sense of "negotiating" a treaty or other agreement, then I have no objection since that usage of the verb implies that the results of the negotiation require approval by some higher authority before acquiring any legal efficacy, i.e., treaties with foreign governments (*see* U.S. Const. art. II, § 2) and contracts with labor unions. In addition, the analogy to the power of a United States attorney to delegate authority to negotiate an immunity agreement necessarily recognizes that the finalized agreement still must be approved

19. "[W]henever Congress conferred a power upon a particular authority in the court-martial system and intended that authority to give others the right to exercise the power, it expressly provided for such designation." *United States v. Butts*, 7 U.S.C.M.A. 472, 474, 22 C.M.R. 262, 264 (1957).

20. *I.e.*, refer charges to trial, *United States v. Bunting*, 4 U.S.C.M.A. 84, 15 C.M.R. 84 (1954); withdraw charge from court-martial, *United States v. Hardy*, 4 M.J. 20 (C.M.A.1977); appoint court members, *United States v. Ryan*, 5 M.J. 97 (C.M.A.1978); detail military judge and trial counsel, *United States v. Newcomb*, 5 M.J. 4 (C.M.A.1978); suspend or remit sentence, *United States v. Butts, supra*; conduct vacation proceedings, *United States v. Bingham*, 3 M.J. 119 (C.M.A.1977).

by the United States Attorney General or his delegate before it has any binding effect. *See* 18 U.S.C. § 6003.

But going even further, the Chief Judge concludes that General Ellis ratified the immunity grant here. I do not agree that General Ellis ratified the alleged immunity agreement, either in fact or in law.[21]

The Chief Judge places reliance on several state court holdings concerning agreement not to prosecute based upon successful taking of polygraph tests. While I find such holdings informative, I do not believe they have any decisional value under the facts of this case. The central theme of these decisions is that when, after indictment, the defendant consents to take a polygraph examination and the prosecution agrees that if the results are favorable, it will dismiss the indictment, the agreement will be enforced against the prosecution. Thus, a presumably innocent defendant offers to take a polygraph examination to *prove* his *innocence,* and the agreement of the prosecution is merely to substitute the test results for a trial by traditional methods. Under such circumstances, the real issue addressed is whether the prosecution agreement is enforceable. These are not plea bargaining cases in the sense of *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), nor are they immunity-grant situations. With these thoughts in mind, we will examine the cases.

In *People v. Reagan,* 395 Mich. 306, 235 N.W.2d 581 (1975), the "[d]efendant was ... charged with assault to do great bodily harm ... and torturing a child." At his arraignment he "stood mute.... Subsequently ... an agreement was ... [made] whereby if defendant [took and] passed a polygraph examination given by the Michi-

gan State Police, his prosecution would be dismissed." The defendant passed two tests. Thereupon, the prosecutor "prepared an order of *nolle prosequi*" which reflected the tests' results and indicated " 'that the injury was at most the result of defendant's negligence.' ... The ... order ... was signed by the trial judge." Subsequently, the prosecutor had "serious misgivings" about the tests' results largely engendered by psychiatric information that in crimes such as that "allegedly committed, a schizophrenic nature" might "distort polygraph test results." Accordingly, the prosecutor "approached [the] defendant," *id.* at 583, and stated that the tests "would be honored only if defendant" would submit "to [truth] serum testing. Defendant refused" and the prosecutor "filed a new complaint on the same charges." Defendant moved to quash based on the agreement, but failed and was ultimately convicted. The Michigan Supreme Court reversed and dismissed the charges. Noting that the principal use of polygraph testing was during the investigatory process prior to the filing of charges, the court said:

> Prosecutorial use of polygraph test results at any stage of the proceedings necessarily has the effect of supplanting the trial process. This is particularly so, where, as here, the prosecution is dismissed after a preliminary examination determination that there was probable cause to believe the crime charged was committed. We cannot commend the wisdom of the action taken by the prosecution and trial judge in this case. Ordinarily, dispositional use of polygraph test results should not occur after judicial proceedings have been instituted.

. . . . .

---

21. Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken. This is as true in the case of the Government as in that of an individual. Knowledge is necessary in any event. Story on Agency, 9th ed. sec. 239, notes 1 and 2. If there be want of it, though such want arises from the neglect of the principal, no ratification can be based upon any act of his. Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them.
*United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 375, 45 L.Ed. 563 (1901). In my view, this standard was not met here.

Defendant had much to gain and relatively little to lose by subjecting himself to the polygraph. The people contend that the bargain offered defendant was a "gift-type" bargain which lacked the consideration necessary to make it binding.[10] While there is precedential reference to the concept of "consideration" for a bargain in the context of the administration of criminal justice,[11] we feel that here the analogy to contract law is inappropriate. The standards of commerce do not govern, and should not govern, the administration of criminal justice.

[10.] A prosecutor who enters into an agreement of this kind has doubts about the defendant's guilt. If the defendant fails the polygraph examination, such doubts may be removed and a faltering investigation energized. The prosecutor is less likely to agree to charge concessions. He knows that if the defendant takes the stand at trial he may wilt under the pressure of intensive cross-examination.

There is no way of assuring that the test results will not come to the judge's attention. The defendant may therefore be unable, as a practical matter, to waive jury trial. The test results may strengthen a judgment of conviction resulting in imposition of a longer sentence or delay in parole.

[11.] See Santobello ... [v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)].

235 N.W.2d at 585. The court then recognized that the agreement with the defendant was entered into by the prosecutor who had "the [sole] power to seek an order of nolle prosequi" and that the trial judge alone had the power to approve such an order. However, the trial court was never apprised of the agreement with the prosecutor. Although "[n]ormally a nolle prosequi is a dismissal without prejudice" to initiation of further prosecution, "[u]nder the facts of this case, ... entry of the order of nolle prosequi was ... the final act of fruition of a binding agreement." The court then chided the prosecutor for not acquainting himself "with the limitations of ... polygraph [testing] before entering into an agreement to dismiss the case on the basis of polygraph results and then proceeding on to nolle prosequi." Further, the court found the agreement was not per se contrary to public policy. It concluded that "a pledge of public faith in this instance gave force to an unwise agreement which became binding upon trial court approval of nolle prosequi." Id. at 587.

In State v. Davis, 188 So.2d 24 (Fla.App. 1966), cert. denied, 194 So.2d 621 (Fla.1966), defendant and the assistant state attorney agreed shortly before trial "that defendant would take a polygraph ... examination ... by an operator [to be] selected by the parties. If the results ... showed defendant was telling the truth in denying his guilt, ... he would not be prosecuted"; if the result was to the contrary, "defendant would enter a plea of guilty to the lesser charge of manslaughter. If the results were inconclusive, neither side would be bound." Id. at 25. The case was taken "off the trial docket for the purpose of giving ... [the] examination." A state deputy sheriff "administered the examination using both the Keeler technique and the Baxter technique." He opined "that defendant was telling the truth." Later, another polygraph operator of the Florida Sheriff's Bureau examined the charts, and, because he disapproved "of the Keeler technique," he did not agree with the results. However, he did indicate that "the Keeler method is [recognized as] a proper technique" and "that much of the outcome of a polygraph test depends upon the examiner." Id. at 26. When the state then attempted to try the defendant, he pleaded the agreement in a motion to quash. The Florida District Court of Appeal held:

It is argued that an immunity agreement may not be pleadable in bar of an adjudication of guilt, although it may affect the right of the court to enforce or to impose a sentence. This seems to be the general rule in cases where immunity is promised an admittedly guilty criminal in return for testifying or giving other evidence against his confederates in the crime. [Citations omitted.]

The case at bar, however, does not involve such a situation. Here a professed innocent man agreed to take a polygraph examination to prove his innocence. He was, however, willing to risk a plea of guilty to a lesser charge if the test indi-

cated he was not telling the truth. Thus, the case is more analogous to those in which immunity is extended to an accused on one charge in return for his plea of guilty to another charge.

. . . . .

Thus, it can be seen that where a plea of guilty is entered in reliance upon a promise to dismiss other charges, the promise may be enforced and raised as a bar to prosecution. The difference between that situation and the one before us is the added act regarding the polygraph examination. Defendant had agreed to plead guilty to manslaughter if the test was not in his favor, but the state had agreed to dismiss the case if the results indicated defendant was telling the truth. This was a pledge of public faith—a promise made by state officials—and one that should not be lightly disregarded.

*Id.* at 27. The court then found that the agreement postulated that the results would be based upon the findings of the person selected to conduct the test. Since he concluded that the defendant was truthful, the state was bound by his, not someone else's, opinion.

In *Butler v. State*, 228 So.2d 421 (Fla. App.1969), a written agreement between the State's Attorney, the defendant and his counsel was made after indictment and before trial, to the effect "that ... defendant would take a polygraph test" and " 'that the state will be bound by the results ... if it develops that he is telling the truth,' " but " 'that if the ... tests result in an opinion by the operator that [he] is not telling the truth,' " such "unfavorable test results" would be admissible "at trial and on appeal... [T]he agreement would be cemented by a stipulation made in open court, with defendant ' * * * being fully advised by the Judge of all of his constitutional rights.' " *Id.* at 422. Defendant took the examination and, in the opinion of the examiner, was found to be truthful when he denied participation or knowledge of the rapes. "The State's Attorney ... [then] obtained an order of nolle prosse." *Id.* at

423–24. However, he subsequently changed his mind and "the defendant was again indicted on the same charge and events." Defendant "unsuccessfully moved to quash on the basis of the agreement," and "was tried [and] found guilty." The court found that "here, a professed innocent man agreed to take a polygraph examination to prove his innocence" and that "the state had agreed to dismiss the case if the results indicated defendant was telling the truth." *Id.* at 424. The state argued that the approval of the court was not obtained, but that argument was rejected by the court.

It is inconceivable and certainly no compliment to the system to suppose that a judge would entertain the stipulation and participate in such proceeding by obtaining the understanding and agreement of, as here, an illiterate charged with a capital offense to the terms of this proposal while disapproving the agreement. Further, it would be unconscionable and a trap of the worst sort to persuade this illiterate to forego his legal right not to take the test and to expose himself to a disaster if the results were unfavorable when—if the results were favorable—it would be said by the authorities that the judge didn't approve the agreement and the state is in no way bound by the agreement.

Criminal prosecutions are, of course, a deadly serious undertaking. They are not a game and sportsmanship is perhaps not a factor. Even so, we feel that our historical ideals of fair play and the very majesty of our government command that an advantage as here reflected not be sanctioned. In parting on this question, we, while honoring the right of the state to choose its procedures and weapons of prosecution, would quite frankly question the wisdom of such contracts which tend to remove the decision to prosecute and the guilt determination from the hands of the traditional authority and delegate it to the conscience of a scientific device—a device which may not be infallible.

*Id.* at 424–25.

In *Chambers v. State*, 146 Ga.App. 126, 245 S.E.2d 467 (Ga.App.1978), "defendant

was convicted of statutory rape of the daughter of a woman with whom he was living. On appeal," the conviction was "reversed . . . on the basis that there was 'no corroborative evidence to the testimony of the alleged victim . . . to prove the incident occurred.'" On further appeal the State "Supreme Court reversed, holding that 'polygraph results were adequate to provide the [necessary] corroboration of the victim's testimony.'" Defendant argued that "it was error for the trial court to admit 'testimony . . . [concerning the results of] the polygraph test given to Defendant under conditions which were contrary to the stipulation entered into between Defendant and The State." The agreement, in essence, was that the defendant's attorney would "'be allowed to review each question'" posed to defendant by the polygraph operator "'prior to the time'" of the test. *Id.* at 468. Certain questions designed to provide the operator with "'control'" or "'guilt complex'" responses were not reviewed in advance by defendant's attorney. The court was faced with the question of whether the agreement under which a polygraph examination was to be conducted should be broadly or narrowly construed. It held:

> If one lesson is to be learned from this decision it is that all agreements of counsel relating to polygraph examination should be placed in writing and the trial court can resolve any differences in a pretrial hearing, or a motion to suppress.
>
> We hold that agreements between counsel regarding conditions for taking a polygraph examination must be scrupulously adhered to by both sides. Deviation from the spirit or letter of the agreement can be grounds for denial of admissibility of test results. [Citations omitted.]
>
> As this is a new evidentiary rule and a new procedural problem, counsel could not reasonably be expected to foresee and provide for all contingencies which could occur. When such unforeseen events occur, and they violate the spirit or the wording of counsel's agreement which is detrimental to a substantial right of an

accused, we cannot say that the error is harmless.

*Id.* at 469.

Finally, in *Workman v. Commonwealth*, 580 S.W.2d 206 (Ky.1979), after being indicted for murder, the defendant entered into an agreement proposed by the Commonwealth "'that if . . . [he] would voluntarily submit to a polygraph examination [conducted] by the Kentucky State Police, and'" the results thereof "'indicated that . . . [he] had no involvement in the shooting . . . the charge would be dismissed. The defendant did submit to . . . [such test] as well as a separate test conducted by'" an out-of-state consulting agency and the results indicated that he was truthful in denying his guilt. *Id.* At trial, defendant moved to dismiss the indictment on the basis of the agreement. "The Commonwealth filed no response to the motion," *id.* at 207, and the trial judge denied it without giving any reasons. Defendant was thereupon "convicted . . . on what may be charitably described as far less than overwhelming evidence." *Id.* at 206. The Kentucky Supreme Court held that the Commonwealth's "agents . . . had apparent if not actual authority" to enter "into an agreement with . . . [defendant] to abandon . . . prosecution of him if he passed a polygraph" test, and that defendant did, in fact, pass such test. The court viewed the issue before it as "not whether the Commonwealth's bargain was wise or foolish," but "whether the Commonwealth should be permitted to break its word." The court further stated:

> The standards of the market place do not and should not govern the relationship between the government and a citizen. . . . If the government breaks its word, it breeds contempt for integrity and good faith.
>
> When as here, our historical ideals of fair play and substantial justice do not permit attorneys for the Commonwealth to disregard promises and fail to perform bargains, it does not permit the judge to allow such iniquities to succeed.

The record ... disclosed no rational basis which would relieve the attorney for the Commonwealth from the performance of his bargain or justify the refusal of the trial judge to grant the motion to dismiss.

*Id.* at 207.

With the exception of *Chambers v. State, supra,* which admittedly concerns the application of a new evidentiary and procedural rule, these cases stand for the proposition that when the state chooses to substitute a polygraph test for the normal trial procedures to determine the guilt or innocence of the defendant, whatever the wisdom of the choice, the state will be bound by the results and not permitted to return to the trial forum for a second chance if it does not find the result to its liking. In effect, the state agreed that if the results of the polygraph established the defendant's innocence, it would forego trial on the facts—an offer not dissimilar to that made by General Ellis in this case. Had petitioner passed the polygraph test based on the statement of May 7, I have no doubt that the agreement would have been honored, and if not, enforced by judicial action as a bar to trial. In contrast here, the polygraph results established petitioner's guilt of new and varied offenses of espionage—a result not envisioned by General Ellis. Hence, I cannot see how these holdings have any decisional value to the resolution of the issue at hand.

Defendant risked nothing in this one-sided "agreement"—and indeed had nothing to lose by taking the polygraph test. It is the people of Michigan who instead are cast in the role of "losers".

*People v. Reagan, supra* at 590 (Coleman, J., dissenting).

The remedy envisioned by Judge Orser would be to suppress the statement made by the petitioner on May 17, 1981, and any other evidence derivative therefrom, "unless the government can demonstrate that said evidence was not obtained by use of the statement." I agree that this is the

correct remedy required by the law of this country. As stated by the Supreme Court of the United States:

Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. While the general common-law practice is to admit evidence despite its illegal origins, this Court in a number of areas has recognized or developed exclusionary rules where evidence has been gained in violation of the accused's rights under the Constitution, federal statutes, or federal rules of procedure.... Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.

*United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) (footnote omitted).

More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. This has been the result reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment. The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.

*United States v. Morrison,* 449 U.S. 361, 365–66, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981) (footnotes omitted) (Sixth Amendment violation).[22]

Whatever may be the cost to someone's career, or to the reputation of a branch of

---

**22.** In view of my Brothers' insistence on applying due process principles to this case, I would point out that the court below concluded "that

agents of the Drug Enforcement Agency effected a willful and unjustified interference with Mrs. Morrison's sixth amendment right to

the armed services, it is our duty to apply the law of the land. There are three parties to each criminal action; one of those parties, not represented before this Court,

has suffered by the majority's decision this day.

I would, therefore, deny the petition.

counsel." *United States v. Morrison*, 602 F.2d 529, 530 (3d Cir. 1979) (footnote omitted). The court specifically rejected the remedies of suppression or reversal of the conviction, holding

that only dismissal of the indictment with prejudice was appropriate. The Supreme Court reversed. 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).